UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 04/13/2023

-----------------------------------------------------------------------X
                      :

MD ABDUL ALIM,                :
                      :

         Plaintiff,     :

                      :             21-cv-2234 (LJL)

    -v-               :

                      :          OPINION AND ORDER

UNITED STATES OF AMERICA,  :

                      :

         Defendant.   :

                      :
-----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      This case arises from a car accident on March 22, 2019, on the Upper West Side of Manhattan, New York between a United States Postal Service ("USPS") truck driven by Eric N. Sackey, and a taxicab operated by plaintiff MD Abdul Alim ("Plaintiff" or "Alim").  On March 15, 2021, Plaintiff filed this action against defendant United States of America ("Defendant"), alleging that he sustained personal injuries in connection with the wrongful or negligent acts of Sackey.  Dkt. No. 1.  The parties conducted discovery between June 2021 to June 2022.  The Court held a bench trial on Plaintiff's claim from February 27, 2023 to March 1, 2023.  *See* Minute Entries, 2/27/2023, 2/28/2023, 3/1/2023.  At the trial, Plaintiff called five witnesses: Alim, Sackey, Paul Hinds (Sackey's supervisor), and Plaintiff's treating physicians, Dr. Ronald A. Daly and Dr. Lulenesh Belayneh.  Defendant relied on its cross-examinations of Alim, Sackey, and Hinds and called two medical experts, Dr. Charla Fischer and Dr. Guillem Gonzalez-Lomas.  Both parties submitted post-trial memoranda of law addressed to the topic of whether the intervening malpractice of Plaintiff's surgeon could give rise to a serious injury compensable under New York's no-fault statute, assuming that the accident itself did not cause a serious injury.  Dkt. Nos. 57–58.

This Opinion and Order constitutes the Court's findings of fact and conclusions of law for purposes of Federal Rule of Civil Procedure 52(a)(1).  To the extent any statement labeled as a finding of fact is a conclusion of law, it shall be deemed a conclusion of law, and vice versa.

**FINDINGS OF FACT**

## I.      The March 22, 2019 Accident

This case arises from a collision between a taxicab operated by Plaintiff and a USPS truck driven by non-party Sackey.  The collision occurred on Amsterdam Avenue, near the intersection of West 71st Street, in Manhattan, New York, on March 22, 2019 (the "March 2019 Accident").

The parties agree on when the collision occurred, what each party was generally doing at the time of the collision, and the vehicles that they were driving.  They disagree, however, on how the collision occurred and whether Plaintiff suffered any injuries as a result of the collision.

It is undisputed that the collision occurred on the morning of March 22, 2019, at approximately 4:20 a.m.  Stipulations of Fact ("Stip.") ¶ 1; Trial Transcript ("Tr.") 25, 164.

On the night of the accident, Plaintiff, a thirty-five-year-old immigrant from Bangladesh, was driving a green-colored 2016 Toyota Corolla that he used for work as a taxi driver.  Stip. ¶ 7; Tr. 159, 163.  At the time of the collision, Plaintiff was beginning his shift.  Tr. at 59.

Sackey, who was a motor vehicle operator for the USPS, was driving a seven-ton USPS truck.  *Id.* at 23.  He was in the process of transporting mail along his regular route from the Morgan Station, a USPS facility located at West 29th Street between Eighth and Ninth Avenues, and the Cathedral Station, a USPS facility located at West 105th Street and Amsterdam Avenue. *Id.* at 23, 25, 55–56; Stip. ¶¶ 5–6.  Both parties agree that Sackey was an employee of the United States and acting within the course of his employment for purposes of the Federal Tort Claims Act.  Stip. ¶ 5.

2

At the time of the collision, both vehicles were traveling on Amsterdam Avenue, a one-way road with three northbound lanes, with Sackey's vehicle directly behind Plaintiff's. Tr. 165. The sun had not yet risen, it was raining, and the road was wet. *Id.* at 28, 58, 164–65, 257.

Plaintiff testified that he had been stopped at a red light in the middle lane of Amsterdam Avenue for approximately half a minute. *Id.* at 166–67. While he was at the stoplight, a truck hit him from behind with a force that he described as "very heavy" and as having "a strong impact." *Id.* at 167. According to Plaintiff, as a result of the impact, he moved his foot from the brake, and his car moved "one length" into the crosswalk. *Id.* at 167–68. Plaintiff testified that his body "lunged forward, and then it came back" and that his knees "hit on the car." *Id.* at 168. Plaintiff's testimony about the nature of the accident was inconsistent. He testified that his head hit against the windshield during the accident, *id.* at 168, 204–05, but he later admitted on cross-examination that his head hit the sunshade above the windshield before stating that he was not really sure where his head hit, but it was "very heavy," *id.* at 205–06. He also claims that he thought he had lost consciousness for a few seconds and had felt everything was "dark" in front of his eyes, *id.* at 168, 207, but later testified that he did not "totally" lose consciousness, *id.* at 207. After the accident, Plaintiff got out of his car and was trembling; Plaintiff described how the person driving the truck was apologetic and said he was very sorry. *Id.* at 169.

Plaintiff testified that he called the police and that after the police came, he provided them with his license, registration, and insurance. *Id.* at 170. Plaintiff, however, did not request medical assistance, *id.* at 209, and resumed working, *id.* at 173. He testified that he did not feel any pain at the time of the accident, *id.* at 208, but he began to feel pain in his knees, shoulder, neck, and head a few hours after the accident, *id.* at 173.

Sackey testified that he was driving northbound in the middle lane of Amsterdam Avenue directly behind Plaintiff's car at approximately twenty or twenty-five miles per hour. *Id.* at 26–28, 59. When he first saw Plaintiff's car, the car was more than a block away, and it was moving. *Id.* at 26, 59. As Sackey crossed 70th Street on Amsterdam Avenue, he observed Plaintiff applying his brakes and stopping less than a block away at a green light at the intersection of Broadway and 71st Street. *Id.* at 27–28, 60. When Sackey was approximately twenty feet from Plaintiff's car, Sackey applied his brakes, but the truck slid and, as Sackey describes it, "touch[ed]" Plaintiff's taxi. *Id.* at 29, 31, 44, 61–62. According to Sackey, the impact did not cause the taxicab to move. *Id.* at 52, 62. Sackey estimated that at the time the vehicles collided, his truck was traveling approximately five miles per hour. *Id.* at 61.

Sackey testified that he immediately called his office and then called the police to report the accident. *Id.* at 38, 62. Sackey then exited his truck and went to Plaintiff's car, where he observed Plaintiff on the telephone. *Id.* at 63. After the police arrived, the officers spoke to both Sackey and Plaintiff. *Id.* at 64. Sackey told the police that Plaintiff's car stopped short, a statement he admitted at trial was inaccurate. *Id.* at 39. He explained during Defendant's cross-examination that the statement was intended to convey that Plaintiff had stopped at a green light. *Id.* at 64. At that point, Sackey observed Plaintiff talking to the police officers and saw him "[w]alking fine." *Id.* at 65. Sackey testified that Plaintiff did not appear to be physically injured, that he was conscious, that he was not holding or touching any part of his body, and that he did not appear to be in pain. *Id.* at 63.

Sackey also spoke to his supervisor, Paul Hinds, about how the accident happened. *Id.* at 39, 66. Hinds, an almost thirty-year veteran of the USPS and Sackey's supervisor at the time of the collision, *id.* at 234, went to the scene of the accident after it occurred on March 22, 2019, *id.*

at 234, 240.  Hinds, who observed Plaintiff after the accident, testified that Plaintiff did not appear to be injured, he was not bleeding, and he did not appear to be in pain.  *Id.* at 263–64.

Sackey and Hinds then returned to the office to fill out paperwork related to the accident. *Id.* at 42–43, 66.  Per USPS policy, another driver continued Sackey's route.  *Id.* at 66.  At the office, Sackey prepared a motor vehicle accident report.  The report states:

> On 3/22/19 I was on my way to the Cathedral Station.  With mail at 71st and 10 Avenue.  I was driving in the middle lane when a taxi just stop [sic] in front of me at the traffic light.  I immediately stop [sic] but because of the rain my truck slid and touched his bumper with minor damage.

PX-4 at US0026.  Sackey testified that the minor damage he was referring to was the damage to his truck.  Tr. 45.  The report does not mention whether Plaintiff's taxicab suffered any damage.[1]

The police report prepared at the time of the accident reflects that Plaintiff told the police that he was stopped at a red light when Sackey rear-ended him and that Sackey stated that Plaintiff stopped short at a green light.  PX-1 at US0026.  The police report further reflected that all parties claimed there were no injuries as a result of the accident.  *Id.*

Hinds prepared his own accident report based on his discussions with Sackey.  Hinds's accident report contains Sackey's description of how the accident occurred:

> On Friday March 22, 2019 at approximately 4:21 am MVO Eric Sackey was involved in a Motor Vehicle Accident with 7-ton truck number 8871626 and assigned block and run 12035 to Cathedral.  MVO Sackey left Morgan proceeding on 10th Avenue.  At the corner of 10th Avenue and 71st Street a green taxi plate number T754673C Tayoto [sic] 2017 was struck in the rear bumper as he was stopped at the light alleged to be red light by vehicle two driver.  Green taxi damage to the rear bumper and left side quarter panel.  No damage to vehicle one.

---

[1] At some point after the accident—up to a month later—Sackey told Hinds that he did not cause damage to Plaintiff's car and, at the request of Hinds, he prepared a buck slip in which he stated: "On that day I told the taxi driver that the damage on the taxi was not cause [sic] by my truck but its already there.  If they investigate this accident they will see that my truck did not cause this damage because the surface is flat.  And also my bumper was lower than the damaged area of the taxi."  PX-4 at US0029; Tr. 48–49.

PX-4 at US0016.  The report contains the statement of "Unknown-SG": "On Friday March 22, 2019 the driver of vehicle two green taxi plate number T754673C Toyota 2017 stated he was in the middle lane at the red light and postal truck hit him in the rear bumper at the corner of 71st street and 10th Avenue.  The damage to the green taxi was rear bumper and left side quarter panel." *Id.* at US0016.  The report also reflects the estimated speed of Sackey's car at the time of the accident as twenty-five miles per hour.  *Id.*  Sackey did not tell Hinds, and Hinds's report does not reflect, that the damage to the back of the taxicab was not a result of the collision.  Tr. 42, 243.

Hinds also testified that it was his understanding when he wrote the report, based on his observations from the scene of the accident and his discussions with Hinds and Plaintiff, that the damage to the back of Plaintiff's car had been caused by the accident.  *Id.* at 248–49, 259.  He also testified that Sackey never told him that taxicab had stopped at a green light, *id.* at 250, but when he wrote in the accident report that it was "alleged" that the light was red, those allegations must have come from the driver of the taxicab, *id.* at 262.  Hinds stated that Sackey's testimony that his car was traveling only five miles per hour at the time of the accident was inconsistent with his understanding.  *Id.* at 253.  Hinds confirmed that there was no damage to the postal truck at the scene of the accident, and that if the truck had, in fact, been traveling at twenty-five miles per hour at the time of impact, there would have been damage to the front of the truck.  *Id.* at 263.

While there is no dispute that the collision did not cause damage to the USPS truck, the parties offered conflicting evidence as to whether the collision caused any damage to Plaintiff's vehicle.  The parties offered photographs taken after the accident that show a dent on the left corner of the trunk of the taxi, damage to the left rear lights, and displacement of the taxi's

bumper.  JX-2–JX-6; Tr. 33.  Sackey testified that the damage visible in those photographs could

not have been caused by his truck; because the front of the USPS truck is flat and made of

plastic, and because the truck's bumper was lower than the damaged area of the taxicab, it was

impossible for the truck to cause the damage present on Plaintiff's car, including the dent on the

left corner of the trunk.  Tr. 50, 54, 67–68, 72, 75.  Sackey also testified that he observed damage

on the rear of Plaintiff's vehicle before the collision.  *Id.* at 34.

## II.     The January 24, 2019 Accident

The March 2019 accident was not Plaintiff's first.  Two months earlier, in January 2019,

he was involved in a car accident with a New York Police Department vehicle (the "January

2019 Accident").  Stip. ¶ 8.  On January 24, 2019, Plaintiff was attempting to make a right turn

when his taxicab was hit by a police car, which was traveling at a high speed on West 125th

Street near the intersection of Saint Nicholas Avenue and West 125th Street in Manhattan, New

York.  DX-1 at Alim_00577; Plaintiff Dep. 45, 50–51; Tr. 196.

## III.    Medical Treatment Before and After the March 25, 2019 Accident

Much of the evidence at trial concerned Plaintiff's medical treatment both before and

after the March 2019 accident.

Plaintiff sought medical treatment on the day of the January 2019 Accident from an

urgent care center called CityMD on West 88th Street in Manhattan.  Tr. 200.  Plaintiff

developed neck pain approximately an hour after the accident.  JX-14 at US-CityMD-00002; Tr.

372.  Plaintiff told the physician at CityMD that the passenger side of his car was struck by

another vehicle in the bus lane as he made a right turn.  JX-14 at US-CityMD-00002; Tr. 373.

Plaintiff stated that he had not been able to work due to the neck pain.  JX-14 at US-CityMD-

00002; Tr. 185.  Plaintiff was diagnosed with a whiplash injury, which causes cramping pain

from muscle spasms but does not reflect injury to the spine's structure.  Tr. 373.  He was

prescribed the over-the-counter medication Aleve and a muscle relaxer and was sent for an x-ray. *Id.* at 374.  Plaintiff also received an x-ray of his cervical spine.  *Id.*; JX-14 at CityMD-00006. The x-ray did not show any injury to the structure of Plaintiff's spine but did reveal some mild disc degeneration on vertebrae C6-7, C5-6, and C4-5, which would be consistent with his symptoms.  Tr. 374–77.

As a result of the January 2019 Accident, Plaintiff began treatment on January 28, 2019 with Dr. Lulenesh Belayneh ("Dr. Belayneh"), a board-certified physical medicine and rehabilitation doctor—a physiatrist—who works for CitiMedical I, PLLC ("CitiMedical").  *Id.* at 200.  Dr. Belayneh exclusively treats workers' compensation and car accident patients at CitiMedical.  *Id.* at 269, 290.  Plaintiff complained that he was experiencing upper back, neck, and shoulder pain.  *Id.* at 200, 379, 294.  Plaintiff reported to Dr. Belayneh that he was rear-ended by another vehicle in a car accident, was thrust back and forth, and felt the impact on his neck and right shoulder.  *Id.* at 379; JX-8 at US-CitiMedical-00515.  The medical records reflect that Plaintiff complained of neck pain rated seven on a one-to-ten scale when exacerbated, that radiated to his right shoulder.  JX-8 at US-CitiMedical-00515.  He also reported intermittent upper back pain, rated six to seven.  *Id.*  Plaintiff stated that he had not returned to work after the January 2019 Accident because he was waiting for his car to be fixed and as a result of his pain. *Id.*

Dr. Belayneh conducted range of motion testing on Plaintiff's cervical spine.  Range of motion testing allows doctors to test whether or not joints in the body are operating as expected. Range of motion testing can be conducted by a goniometer, which is a tool that measures angulation, Tr. 380, or can be conducted via visual inspection.  Using a goniometer is considered to be more precise and reproducible, compared with the visual inspection method which is not as

precise. *Id.* Range of motion testing can either be active or passive. In active range of motion testing, the patient is asked to move the body part at issue and to indicate when further movement becomes restricted or painful. *Id.* at 500. In contrast, during passive range motion testing, the examiner assists the patient when moving the body part and stops when the patient indicates that the movement has become restricted or painful. *Id.* Passive range of motion testing is considered more objective because the examiner controls the body's movement and does not have to make a determination as to why somebody might or might not move a body part. *Id.* However, for certain body parts, including the spine, active range of motion testing can be safer. *Id.* at 411.

In January 2019, Dr. Belayneh conducted range of motion testing on Plaintiff's cervical spine, lumbosacral spine, and right shoulder. JX-8 at US-CitiMedical-00028–29. Dr. Belayneh did not use a goniometer to conduct the range of motion testing on the cervical and lumbar spine; she relied on visual observation. Tr. 295.

Dr. Belayneh found that Plaintiff's cervical spine had a flexion range of motion of forty degrees; extension range of motion of forty degrees; left rotation range of motion of forty degrees; right rotation range of motion of sixty degrees; left lateral flexion of twenty degrees; and right lateral flexion of twenty degrees. JX-8 at US-CitiMedical-00516. She also measured Plaintiff's range of motion on the lumbar spine. His lumbar spine had a flexion range of motion of eighty degrees; extension range of motion of twenty degrees; left rotation range of motion of thirty degrees; right rotation range of motion of thirty degrees; left lateral flexion of twenty degrees; and right lateral flexion of twenty degrees. *Id.* These measurements reflect ranges of motion slightly below what is considered normal. *See, e.g.*, Tr. 379.

Dr. Belayneh diagnosed Plaintiff with a cervical spine sprain or strain, a thoracic spine sprain or strain, and a right shoulder rotator cuff sprain.  JX-8 at US-CitiMedical-00517.  Dr. Belayneh noted that Plaintiff had an impairment rating of temporary total disability of 100%, and instructed Plaintiff to follow up for another appointment in three weeks.  *Id.* at US-CitiMedical-00518.  Plaintiff failed to attend his follow-up appointment with Dr. Belayneh after his January 28, 2019, medical evaluation.  Tr. 296.  Dr. Belayneh referred Plaintiff for magnetic resonance imaging scans ("MRI") of his cervical spine, thoracic spine, and right shoulder.  JX-8 at US-CitiMedical-00518.

An MRI of Plaintiff's cervical spine was conducted on February 27, 2019.  *Id.* at US-CitiMedical-00568; Tr. 568.  The MRI report states that "C5-C6 left paracentral subligamentous herniation with left exiting nerve root impingement."  *Id.* at US-CitiMedical-00568.  The MRI of Plaintiff's thoracic spine on March 1, 2019 found no evidence of significant bulge or herniation, consistent with a normal thoracic spine.  Tr. 392–93; JX-8 at US-CitiMedical-00566.

As noted previously, Plaintiff did not seek medical treatment in the immediate aftermath of the March 2019 accident.  Instead, he put an ice compress to his knees, used Vicks VapoRub for his back and neck, and took a Tylenol.  Tr. 173.  However, six days after the March 19, 2019 accident, he returned to Dr. Belayneh for an initial physiatric evaluation, because the pain, which he attributed to the accident, had not subsided.  JX-8 at US-CitiMedical-00285; Tr. 173, 268.

In her evaluation report from March 25, 2019, Dr. Belayneh documented the circumstances surrounding Plaintiff's accident.  Plaintiff reported to her that "he was a seatbelted driver waiting on a red light when a truck rear-ended his car," that the "[a]irbag did not deploy," and that "[a]s a result of the impact he was pushed forward and he hit his forehead against the

sunshade and also banged the knees against the steering wheel." JX-8 at US-CitiMedical-00285. Plaintiff also reported that he "'blacked out' for few moment [sic] (could not quantify the time) and after waking up he felt dizzy." *Id.* Plaintiff reported constant neck pain, and Dr. Belayneh stated that he "had a prior history of motor vehicle accident on 01/24/2019 injury to the neck for which he is currently receiving treatment." *Id*. Plaintiff also reported that he had intermittent low back pain and had intermittent aching pain in both knees, with the aching in his left worse than that of his right one. *Id.* While neither knee buckled, the pain was aggravated when he squatted and negotiated stairs. *Id.* Dr. Belayneh reported that Plaintiff ambulated with a normal gait and was in no acute distress, but had a throbbing headache. *Id.*; Tr. 271.

Dr. Belayneh noted that Plaintiff was currently working and did not miss time from work due to the March 2019 Accident. JX-8 at US-CitiMedical-00288.

Dr. Belayneh found that there was tenderness over Plaintiff's paracervical spine and that his range of motion was slightly reduced, that there was tenderness over the paralumbar musculature, that his range of motion was reduced, and that there was tenderness over the medial and lateral joint line of both knees. Tr. 272. She did not, however, see any bruising on his knees or any swelling. *Id.* at 299.

Dr. Belayneh measured the range of motion of Plaintiff's cervical spine, lumbar spine, and knees. For Plaintiff's knees, Dr. Belayneh conducted an active range of motion test, which as noted is less objective than its passive counterpart. *Id.* at 237, 500. She took measurements of Plaintiff's extremities using a goniometer device. *Id.* at 273. However, she did not use a goniometer for the measurements of his lumbar or cervical spine, and instead relied on visual observation to determine Plaintiff's range of motion. *Id.* at 295.

Dr. Belayneh found that Plaintiff's cervical spine had a flexion range of motion of forty degrees; extension range of motion of forty degrees; left rotation range of motion of sixty degrees; right rotation range of motion of sixty degrees; left lateral flexion of twenty degrees; and right lateral flexion of twenty degrees.  JX-8 at US-CitiMedical-00286.  These ranges of motion were slightly limited but were unchanged from the range of motions observed at the January 28, 2019 examination.  Tr. 379.

Dr. Belayneh also measured Plaintiff's range of motion on the lumbar spine.  The ranges of motion were slightly decreased from the ranges that Dr. Belayneh observed on January 28, 2019, but could be characterized as almost normal.  *See* Tr. 322 (testifying that the decreases in Plaintiff's ranges of motion was "not a very significant finding" and a "very mild limitation").  Plaintiff's lumbar spine had a flexion range of motion of sixty degrees; extension range of motion of ten degrees; left rotation range of motion of twenty degrees; right rotation range of motion of twenty degrees; left lateral flexion of ten degrees; and right lateral flexion of ten degrees.  JX-8 at US-CitiMedical-00287.

Dr. Belayneh examined the ranges of motion of both Plaintiff's right and left knee and found that he had an essentially normal range of motion of zero to 130 degrees in both knees.  JX-8 at US-CitiMedical-00287; Tr. 475.  Dr. Belayneh also conducted a McMurray test and a Lachman's test.[2]  JX-8 at US-CitiMedical-00287.  On both knees, the McMurray tests were positive, and the Lachman tests were negative.  *Id.*

---

[2] A McMurray test is used by examiners to test for meniscal tears.  A positive McMurray test indicates a likely meniscal tear, which can be further evaluated via an MRI.  A Lachman test assesses whether a patient is suffering from an anterior cruciate ligament injury.  Both tests are conducted by the examiner directly on a patient's knee and leg.  Def. Proposed Findings of Fact & Conclusions of Law 13.

Dr. Belayneh diagnosed Plaintiff with a headache, cervical spine radicular pain, lumbar spine sprain/strain, traumatic myofascitis, and sprains or strains of both knees. *Id.* She characterized the diagnosis as a working diagnosis, subject to confirmation through further testing. Tr. 273–74. Dr. Belayneh referred Plaintiff to physical therapy and an interventional pain specialist,[3] and prescribed Plaintiff 500 mg tablets of naproxen, known by its brand name Aleve. JX-8 at US-CitiMedical-00288; Tr. 478, 276. She also referred Plaintiff for MRIs of his cervical spine, lumbar spine, left knee, right knee, and brain. Tr. 274, 382; JX-8 at US-CitiMedical-00288.

An MRI of Plaintiff's cervical spine was conducted on April 7, 2019. Tr. 396. The radiologist noted in the MRI report: "C5-C6 acute broad-based posterior central subligamentous herniation with regional nerve root impingement and concomitant posterior annular tear." JX-8 at US-CitiMedical-00243; *see* JX-10 (MRI imaging from after the March 2019 Accident). Despite the fact that Plaintiff had undergone an MRI of his cervical spine at CitiMedical on February 27, 2019, the radiologist noted that no prior studies were available for comparison. JX-8 at US-CitiMedical-00243.

An MRI of Plaintiff's lumbar spine was conducted on April 15, 2019. Tr. 404. The MRI report noted: "L4-L5 and L5-S1 mild diffuse posterior disc bulges effacing epidural fat and contacting the thecal sac with regional nerve root encroachment." JX-8 at US-CitiMedical-00482; *see* JX-10.

An MRI of Plaintiff's left knee was conducted on April 4, 2019. JX-8 at US-CitiMedical-00245; *see* JX-10. The MRI report stated that the radiologist found a horizontal

---

[3] Plaintiff was offered epidural injections for pain to his lumbar spine and cervical spine, but declined the treatment. Tr. 279.

tear along the peripheral edge at the junction of the body and posterior horn medial meniscus, as well as joint effusion.  JX-8 at US-CitiMedical-00245; Tr. 478–79.  According to Plaintiff's orthopedist, this kind of tear is often a chronic and degenerative condition.  Tr. 117.

Finally, an MRI of Plaintiff's right knee was conducted on April 12, 2019.  JX-8 at US-CitiMedical-00250.  The MRI report reflected tendinosis of the distal patellar tendon and a small effusion.  *Id.*  The radiologist recommended that "[i]f there is intractable pain, consider arthroscopy or MR arthrogram for more detailed evaluation."  *Id.*

Plaintiff visited Dr. Belayneh for a follow-up evaluation on April 15, 2019.  *Id.* at US-CitiMedical-00304.  Plaintiff reported that the physical therapy he had been receiving three times a week had been helping to alleviate his pain.  *Id.*  He indicated that his neck pain and headache had improved significantly, his lower back pain and knee pain were slightly better, and he experienced no buckling of his knees.  *Id.*  He reported that the pain in his lower back became aggravated with excessive bending or after sitting for more than 45 minutes to an hour.  *Id.*  He also reported that he continued to work as a taxi driver, but likely worked fewer hours than before.  *Id.*  Dr. Belayneh reported that Plaintiff was alert and oriented, ambulated with a normal gait, and was not in acute distress.  *Id.*

Dr. Belayneh again measured Plaintiff's ranges of motion of his cervical spine, his lumbar spine, and his knees.  She measured ranges of motion for Plaintiff's cervical spine that were identical to those she measured during her January 28, 2019 and March 25, 2019 examinations.  *Id.* at US-CitiMedical-00308.  Plaintiff's ranges of motion of his lumbar spine were improved from his previous visit:  Dr. Belayneh measured a flexion range of motion of seventy degrees; extension range of motion of ten degrees; left rotation range of motion of twenty-five degrees; right rotation range of motion of twenty-five degrees; left lateral flexion of

ten degrees; and right lateral flexion of ten degrees.  *Id.* at US-CitiMedical-00305.  Dr. Belayneh found that Plaintiff continued to have a range of motion of zero to 130 degrees in both knees.  *Id.* The McMurray tests on both knees were positive, and the Lachman tests were negative.  *Id.*

Dr. Belayneh recommended that Plaintiff continue physical therapy three times a week, continue to take naproxen, and scheduled a follow-up visit in four weeks.  *Id.* at US-CitiMedical-00306.  She also referred Plaintiff to an orthopedic surgeon, Dr. Ronald Daly ("Dr. Daly"), because his MRI contained an abnormal finding.  *Id.*  Dr. Daly is a general orthopedist practitioner now affiliated with Hudson Regional Hospital in Meadowlands, New Jersey, but, at the time of the events in question, was working under the umbrella of CitiMedical.  Tr. 77, 88, 175.  Dr. Daly has never been board certified in any area of medicine and does not specialize within orthopedics.  *Id.* at 110.

On May 10, 2019, Plaintiff saw Dr. Daly for a consultation concerning his knees.  JX-8 at US-CitiMedical-00276.  Plaintiff reported to Dr. Daly that after his car was rear-ended, he "began to experience the immediate onset of pain" in his low back, neck, and both knees and that "he lost consciousness for an undetermined amount of time at the time of the accident."  *Id.* Plaintiff complained of pain in both knee joints, which worsened when he ascended or descended stairs, and reported that his left knee pain was worse than his right knee pain.  *Id.*  He also reported that he had taken no time off from his job as a taxi driver and was currently working. *Id.* at US-CitiMedical-00277–78; Tr. 92, 120.

Dr. Daly tested Plaintiff's active range of motion in both of his knees without using a goniometer and measured an active range of motion of between zero and ninety degrees.  JX-8 at US-CitiMedical-00277.  Dr. Daly recommended a left knee arthroscopy because of the amount

of time that had elapsed since his accident and Plaintiff's apparent failure to respond to more conservative treatment.  *Id.* at US-CitiMedical-00278.

In his assessment, Dr. Daly copied verbatim the findings of the MRI reports.  He stated the right knee showed "tendinosis of the distal patellar tendon."  *Id.* at US-CitiMedical-00277. He stated that the left knee showed a "horizontal tear along the peripheral edge at the junction of the body and posterior horn medial meniscus."  *Id.*  Dr. Daly admitted at trial that he did not review the MRI images himself and instead relied solely on the MRI reports.  Tr. 124.

Plaintiff had an additional follow-up visit with Dr. Belayneh on May 21, 2019.  JX-8 at US-CitiMedical-00307.  He again reported that the physical therapy had been helping to alleviate his pain:  Though his neck pain was significantly improved, he indicated that his low back pain persisted and became aggravated after sitting for more than an hour.  *Id.* at US-CitiMedical-00307.  He also indicated that his right and left knee pain was intermittent with no buckling and that his left knee pain was aggravated when walking and squatting.  *Id.*  He noted that he was currently working but that he worked fewer hours than previously.  *Id.*  Dr. Belayneh reported that Plaintiff ambulated with a normal gait and that he was not in acute distress.  *Id.*  In her assessment, she also copied the findings of the MRI report—right knee tendinosis of the distal patella and a left knee medial meniscal tear.  *Id.* at US-CitiMedical-00309.

During the May 21, 2019 visit, Dr. Belayneh conducted range of motion testing on the cervical and lumbar spine and on both knees.  *Id.*  Plaintiff's range of motion of the cervical spine was unchanged.  *Id.*  His range of motion of his lumbar spine improved further: Dr. Belayneh recorded a flexion range of motion of seventy degrees; extension range of motion of fifteen degrees; left rotation range of motion of thirty degrees; right rotation range of motion of thirty degrees; left lateral flexion of ten degrees; and right lateral flexion of ten degrees.  *Id.* at

US-CitiMedical-00308.  Contrary to the findings of Dr. Daly eleven days earlier, Dr. Belayneh found that the ranges of motion in both of Plaintiff's knees were zero to 130 degrees.  *Id.*  Dr. Belayneh recommended that Plaintiff continue his physical therapy and receive a pain-management evaluation.  *Id.* at US-CitiMedical-00309.  She also recommended that he continue his current job as long as he could tolerate the pain.  *Id.*

Thereafter, Plaintiff continued physical therapy, until he had surgery on his left knee, as discussed below.  Tr. 176.  Plaintiff testified that the outcomes of his physical therapy sessions were mixed; on some days, he would feel better and on others, he would feel worse.  *Id.*  He also indicated that although it was recommended that he receive injections for pain management, he refused the intervention because he was "scared of needles."  *Id.*

On May 23, 2019, Plaintiff saw his primary care physician Dr. Mohammed Uddin ("Dr. Uddin").  JX-13 at US-SafeHealth-00012; Plaintiff Dep. 59.  His medical record from that visit indicate that Plaintiff complained of abdominal pain as a result of food that he had eaten, but he denied that he suffered any "neck pain or stiffness," and he conveyed no other complaints to Dr. Uddin.  JX-13 at US-SafeHealth-00012.

On October 5, 2019, Plaintiff again saw his primary care physician, Dr. Uddin, for an annual wellness visit.  *Id.* at US-SafeHealth-00017.  His medical records from that visit reflect that Plaintiff complained of itching in his legs, but Plaintiff again denied having "neck pain or stiffness," and indicated that he did not have "joint pain, swelling, muscle weakness, unilateral deficits, or fatigue."  *Id.* at US-SafeHealth-00018.  He also had a normal range of motion in his lower extremities.  *Id.*  During Plaintiff's deposition, he admitted that he never told his primary care physician that he had been in a car accident and did not convey any of the issues resulting from the March 2019 Accident to Dr. Uddin.  Plaintiff Dep. 94–96.

On December 19, 2019, Plaintiff saw Dr. Daly for an orthopedic follow-up visit.  JX-8 at US-CitiMedical-00279.  Dr. Daly reported that Plaintiff was working as a taxi driver and had taken no time off.  *Id.*  He recorded Plaintiff's active range of motion of both knees as zero-to-ninety degrees.  JX-8 at US-CitiMedical-00280.  He again recorded the MRI's findings verbatim and offered Plaintiff a left knee arthroscopy.  *Id.*; Tr. at 280.

Dr. Daly saw Plaintiff for another orthopedic follow-up visit on February 15, 2021.  JX-8 at US-CitiMedical-00282.  Plaintiff again reported that he was a taxi driver and had taken no time off.  *Id.* at US-CitiMedical-00283.  Dr. Daly found that the active range of motion of Plaintiff's right knee had improved slightly to zero-to-115 degrees and that the active range of motion for Plaintiff's left knee improved slightly to zero-to-100 degrees.  *Id.*  He also noted that Plaintiff was "currently working."  *Id.* at US-CitiMedical-00284.  "[D]ue to the interval since the accident and the non-response to conservative modalities of treatment," he again had offered Plaintiff a left knee arthroscopy, which Plaintiff accepted.  *Id.*

On June 17, 2021, Esmaus Santiago ("PA Santiago"), a certified physician assistant working with Dr. Daly, performed an examination of Plaintiff's knees.  *Id.* at US-CitiMedical-00343, 46; Tr. 502.  PA Santiago examined the range of motion of both Plaintiff's right and left knees, and recorded range of motions different from Dr. Daly's measurements, but consistent with Dr. Belayneh's:  He found that Plaintiff had a passive range of motion of zero-to-130 degrees in both knees and an active range of motion of zero-to-125 degrees.  JX-8 at US-CitiMedical-00344–45; Tr. 502.  These measurements reflect an essentially normal range of motion, without any limitation or impairment.  Tr. 502.

On June 18, 2021, Dr. Daly performed a left knee arthroscopy on Plaintiff to fix his apparent meniscal tear.  JX-12 at US-ISASC-00018-22, 26–28.  Dr. Daly did not review the

underlying images of Plaintiff's MRI prior to the surgery, and admitted that he did not review the MRI report prior to surgery.  Tr. 98, 118, 131.  Indeed, there is no evidence that either Dr. Belayneh or Dr. Daly ever reviewed the underlying MRI images during the course of Plaintiff's treatment.  Dr. Daly testified that he did not review any of the MRI images taken of Plaintiff's knee while treating Plaintiff, *id.* at 118, and Dr. Belayneh could not recall ever reviewing the MRI images of Plaintiff's cervical or lumbar spine or his left knee, *see id.* at 314, 325.

The arthroscopy revealed that, contrary to what was reported on the April 2019 MRI, there was no horizontal tear of the medial meniscus in Plaintiff's left knee.  *Id.* at 118–19.  In short, the only meniscus tear that had been reported in the immediate aftermath of the March 2019 accident did not exist.  Instead, Dr. Daly's postoperative report indicated that he identified the following during the arthroscopy:  "superolateral plica, tear of the body of the medial meniscus [specifically, a radial margin tear], tear of the posterior horn of the lateral meniscus [specifically, a tear along the radial margin near the root], a Grade II chondral lesion of the trochlea, loose bodies and hypertrophic villous synovitis."  JX-12 at US-ISASC-0018–22 (cleaned up).  Tellingly, none of these injuries to the left knee were reflected in any of the reports prepared after the March 2019 accident.  Tr. 118.

During the surgery, Dr. Daly removed a portion of Plaintiff's medial meniscus.  *Id.* at 95. He also shaved and burned Plaintiff's lateral meniscus, excised his plica, burned his trochlea, and conducted what he called a "partial synovectomy."  *Id.* at 95–96.  Dr. Daly testified that he repaired the two meniscus tears he observed—one to the medial meniscus and the other to the lateral meniscus.  *Id.* at 96.  He acknowledged that the tears he repaired were not present on the MRIs following the March 2019 accident.  *Id.* at 137.

The range of motion of Plaintiff's left knee changed dramatically after the June 18, 2021 surgery.  The trial record contains Dr. Belayneh's physiatric follow-up reports of Plaintiff from September 15, 2021, November 1, 2021, December 13, 2021, February 16, 2022, and April 18, 2022.  *See generally* JX-11.  During each visit, Dr. Belayneh performed range of motion testing. Plaintiff's range of motion results for the cervical spine, lumbar spine, and right knee were essentially unchanged from the results for the prior two years.  *See id.* at Alim_00559–71. However, the range of motion of Plaintiff's left knee deteriorated markedly: whereas prior to the surgery, Plaintiff's left knee range of motion was consistently between zero and 130 degrees according to Dr. Belayneh's measurements, after the surgery, his left knee range of motion fell to zero-to-115 degrees.  *Id.*

Plaintiff's reported ability to work also changed dramatically after the surgery.  In the twelve months after the March 2019 accident, Plaintiff did not report taking any time off from work.  Tr. 310.  However, Dr. Belayneh's follow-up report from November 1, 2021, indicates that Plaintiff had not been working since the surgery.  JX-11 at Alim_00562.  Dr. Belayneh reported that Plaintiff was unable to return to work due to persistent pain and she advised him to try working part-time.  *Id.* at Alim-00563.  Dr. Belayneh's December 13, 2021 and February 16, 2022 reports both indicate that Plaintiff was unable to return to work after the surgery because of the pain in his knee.  *Id.* at Alim_00566, Alim_00569.  Dr. Belayneh's April 18, 2022 report states that Plaintiff continued not to work, but suggested that he could "work light duty job with [ ] lifting no more than 15-20 pounds occasionally, limit squatting/negotiating stairs" and that he could "work part time taxi driving since the right knee is functional."  *Id.* at Alim_00572.

On June 29, 2021, Dr. Daly conducted a post-operative evaluation of Plaintiff.  JX-8 at US-CitiMedical-00270.  According to the report, Plaintiff had taken no time off from his job as a

taxi driver and was currently working.  *Id.* at US-CitiMedical-00271.  Dr. Daly measured an

active range of motion in Plaintiff's left knee of between zero and 112 degrees.  *Id.*  He

concluded that Plaintiff's left knee was improving, and suggested Plaintiff receive physical

therapy.  *Id.* at US-CitiMedical-00272.

On September 1, 2021, Dr. Daly conducted another orthopedic post-operative evaluation

of Plaintiff.  *Id.* at US-CitiMedical-00273.  During that evaluation, Plaintiff indicated that he was

continuing to work as a taxi driver and had taken no time off.  *Id.* at US-CitiMedical-00274.

Plaintiff was able to do seated squats without pain, Tr. 145–46, and had an active range of

motion in both knees of zero-to-118 degrees, JX-8 at US-CitiMedical-00277.  Dr. Daly

concluded that Plaintiff's left knee was "improving . . . post left knee arthroscopy."  *Id.* at US-

CitiMedical-00274.  Dr. Daly also found that both the Lachman's and McMurray tests were

negative for both knees during Plaintiff's September examination.  *Id.*

On March 17, 2022, PA Santiago performed an examination of Plaintiff's knees.  JX-11

at Alim_00573.  PA Santiago measured the range of motion of Plaintiff's left knee using a

goniometer, finding that he had a passive range of motion of zero to 130 degrees in his left knee

without pain or spasm.  *Id.* at Alim_00575.  These measurements reflect an essentially normal

range of motion without limitation or impairment.  *Id.*  PA Santiago also conducted Lachman's

and McMurray tests on both of Plaintiff's knees and found that both were negative.  *Id.*

## IV.  Expert Testimony on Behalf of Plaintiff

In addition to offering his medical records, Plaintiff elicited opinions from each of

Plaintiff's treating physicians.  Dr. Belayneh testified that she had an opinion within a reasonable

degree of medical certainty that Plaintiff's knee injuries were related to the March 2019 accident.

Tr. 283.  She further testified that because Plaintiff had not previously reported lower back pain,

her opinion was that Plaintiff's lumbar spine symptoms were related to the March 2019 accident.

*Id.* at 283–84.  She also assumed that the March 2019 accident exacerbated Plaintiff's neck pain because, contrary to her expectation that the pain would have decreased after two months of treatment, the pain persisted.  *Id.* at 285.  Dr. Belayneh further testified that she had an opinion within a reasonable degree of medical certainty that the injury to Plaintiff's left knee was not reversible and was permanent, *id.* at 286, and that Plaintiff suffers from a permanent consequential limitation of the left knee, *id.* at 187.

Dr. Daly opined that he observed tears to the meniscus during the arthroscopy and that those tears, within a reasonable degree of medical certainty, were the result of the March 2019 accident.  *Id.* at 96–97.  He based his opinion on the fact that Plaintiff had come to him within a reasonable time after the accident and that there was supporting evidence from the MRI.  *Id.* at 97.  Based on his September 2021 evaluation report, Dr. Daly opined that Plaintiff suffered permanent damage to his left knee joint.  *Id.* at 105.

Both Dr. Belayneh and Dr. Daly testified that they exclusively saw patients involved in workers' compensation and personal injury cases.  *See id.* at 111, 290.  Both testified that they rely exclusively on the patient to tell them how an injury was caused.  *See id.*  And both testified that they have never rendered an opinion as an expert witness that an accident was not the cause of a patient's injury.  *See id.* at 115–16, 292–93.

## V.      Government Experts

The Government called two expert witnesses to testify:  Dr. Carla Fischer ("Dr. Fischer") and Dr. Guillem Gonzalez-Lomas ("Dr. Lomas").

### A.      Dr. Carla Fischer

Dr. Fischer is an Associate Professor of Orthopedic Surgery at the New York University Grossman School of Medicine and an attending surgeon at New York University Langone Health.  Tr. 361.  She received her medical degree in 2006 from the University of Southern

California, completed a residency at Columbia University and a fellowship at New York University (formerly Hospital for Joint Diseases), and received her board certification in orthopedic surgery in 2015. *Id.* at 361–62. She is a member of numerous professional societies and has published in scholarly journals in the field of orthopedic surgery. *Id.* at 363–65.

Dr. Fischer examined the MRI images of Plaintiff's cervical and lumbar spines. She opined that the February 27, 2019 MRI of Plaintiff's cervical spine, conducted before the March 2019 Accident, showed a degenerative C5-6 disc herniation with moderate stenosis due to a broad-based degenerative herniation. *Id.* at 382–90. In short, the conditions reflected on the MRI were consistent with "normal aging, wear and tear" that could result in an asymptomatic presentation or presentation with some arm or neck pain. *Id.* at 390–91. They were not consistent with an acute injury. *Id.* at 390.

Dr. Fischer further testified that the April 7, 2019 MRI of Plaintiff's cervical spine, taken after the March 2019 Accident, also showed a degenerative disc herniation in his cervical spine at C5-6 and did not show an annular tear. *Id.* at 398. A comparison of the MRI images taken before and after the March 2019 Accident, revealed that there was no change to the cervical spine. *Id.* at 399, 403; JX-8 at US-CitiMedical-00243. *Compare* JX-9 (MRI imaging from after the January 2019 Accident), *with* JX-10 (MRI imaging from after the March 2019 Accident).[4] There was no evidence of an acute disc herniation or an acute injury on the MRI. Tr. 399, 403.[5]

----

[4] Dr. Belayneh also agreed that the range of motion between January and March was identical and that the MRI images taken before and after the March 2019 Accident were substantially the same. Tr. 285, 309–10.

[5] The MRI of Plaintiff's thoracic spine on March 1, 2019 showed no evidence of significant bulge or herniation and was consistent with a normal thoracic spine, and inconsistent with Dr. Belayneh's diagnosis of a strain or sprain. *Id.* at 392.

Dr. Fischer performed an independent medical examination of Plaintiff approximately one year before trial. *Id.* at 408. Plaintiff reported that he was working as a taxi driver at the time and had some neck and back pain. *Id.* at 409–10. Dr. Fischer observed Plaintiff's gait, which was normal; she could not identify any abnormalities while he was walking. *Id.* at 410. Dr. Fischer also testified that Plaintiff got on and off the examination table easily. *Id.* Dr. Fischer performed active range of motion testing on Plaintiff's cervical spine with a goniometer and determined that he was "a little limited but not terribly limited," concluding that the cervical range of motion testing did not indicate that Plaintiff had significant limitations associated with his cervical spine. She also measured Plaintiff's lumbar range of motions and found that it was not severely limited and did not indicate any significant limitations associated with his lumbar spine. *Id.* at 411–12. Finally, with respect to Plaintiff's cervical spine, Dr. Fischer examined the strength of Plaintiff's arms and conducted sensory and reflex testing of the cervical spine, including a Spurling's and a Hoffman's test.[6] *Id.* at 412–13. With respect to Plaintiff's lumbar spine, Dr. Fischer conducted tests for strength, sensation, and reflexes and did a straight leg raise test to look for radiculopathy. *Id.* at 412–13. All of the tests were normal; none suggested that Plaintiff suffered from any structural spinal issues or that his nerves were damaged. *Id.* at 413–15.

After examining Plaintiff and after reviewing Plaintiff's medical records, Dr. Fischer reached the opinion that there was no injury to Plaintiff's spine after the March 2019 Accident and that he had no limitations as a result of the accident. *See id.* at 370, 408, 415–16. She also reached the opinion that the March 2019 Accident did not negatively affect any of Plaintiff's

---

[6] A Spurling's test is used to assess whether a patient suffers from cervical radiculopathy, or a pinched nerve, in the cervical spine and a Hoffman's test assesses spinal cord compression. *Id.* at 314, 413.

preexisting spinal conditions.  *Id.* at 371, 408.  She further concluded that Plaintiff did not have

any limitations on activities of daily living due to conditions in his spine resulting from the

March 2019 Accident and that no further orthopedic treatment relating to his spine was

necessary.  *Id.* at 416.  She based her opinion that Plaintiff did not suffer an injury to his cervical

spine from the March 2019 accident by comparing the MRI images from before and after the

accident, which revealed no change.  *Id.* at 371, 399, 403.  She based her opinion that Plaintiff

did not suffer an injury to his lumbar spine as a result of the March 2019 Accident on the MRI

images taken after the accident, which did not reveal an injury or abnormal condition, and on the

fact that Plaintiff's complaints about his lumbar spine did not change after the March 2019

Accident.  *Id.* at 371, 408.  These conclusions were supported by her examination of Plaintiff,

which found that Plaintiff did not have any limitations to his spine—the tests revealed Plaintiff

was neurologically intact, had full strength in his arms and legs, and could walk and get on and

off of the exam table normally.  *Id.* at 371–72.

### B.     Dr. Guillem Gonzalez-Lomas

Dr. Lomas is an Assistant Professor of Orthopedic Surgery at New York University

Langone Medical Center and an attending physician there.  *Id.* at 466.  He received his medical

degree from Columbia University College of Physicians and Surgeons in 2003 and completed an

internship and a residency in orthopedic surgery at Columbia Presbyterian Hospital.  *Id.*  He

completed a sports medicine fellowship at the Kerlan-Jobe Orthopedic Clinic in Los Angeles.

*Id.* at 467.  He received his board certification in orthopedic surgery in 2012 and has maintained

his certification continuously since then.  *Id.*  He is a member of numerous professional societies

and has published approximately fifty articles in scholarly journals.  *Id.* at 468–69.

Dr. Lomas reviewed the MRI images from the April 4, 2019 MRIs taken of Plaintiff's

left knee.  *Id.* at 478–79.  The radiologist report concluded that the MRI images revealed a

horizontal tear along the peripheral edge at the junction of the body and posterior horn, or the medial meniscus, and a joint effusion.  JX-8 at US-CitiMedical-00245.  Dr. Lomas disagreed with those findings.  Tr. 479.  In particular, Dr. Lomas concluded, based on his review of the MRI images of Plaintiff's left knee, that there was no medial tear as of April 4, 2019.  *Id.* at 479–80, 488.  There was also no evidence of bone bruising, edema, hypertrophic synovitis, or plica and that based on those findings, there was "a lack of direct trauma to the knee [from the March 2019 Accident] or at least of any clinically relevant trauma to the knee."  *Id.* at 496.  Dr. Lomas concluded that there was no structural evidence on the MRI that there was any clinically relevant damage to Plaintiff's left knee and that following the accident, Plaintiff had "an essentially intact [left] knee with no evidence of any substantial trauma."  *Id.*

Dr. Lomas also reviewed the MRI images from the MRI of Plaintiff's right knee taken on April 12, 2019.  *Id.* at 497.  The radiologist report concluded that Plaintiff suffered from "[t]endinosis of the distal patellar tendon" and "small effusion."  JX-8 at US-CitiMedical-00250.  The report also recommended with respect to the right knee, but not with respect to the left, that if pain was "intractable," Plaintiff should "consider arthroscopy . . . for [a] more detailed evaluation."  *Id.*  Dr. Lomas concluded from his examination of the MRI images of Plaintiff's right knee that there was no evidence of bone bruising, edema, hypertrophic synovitis, or trauma to the right knee.  Tr. 498.  He concluded that there was a "little signal" of tendinosis of the distal patellar tendon—which connects the kneecap to the shin—but that the evidence indicated the tendinosis was chronic and "certainly nothing acute*."  Id.*  From his review, Dr. Lomas concluded that there were no clinically significant structural injuries to Plaintiff's right knee that would have arisen from banging his knee on a steering wheel of a car and that Plaintiff had suffered no acute trauma to his right knee.  *Id.* at 498–99.

26

Dr. Lomas also gave testimony about the arthroscopy and corresponding surgery conducted by Dr. Daly on Plaintiff's left knee on June 18, 2021. *See id.* at 501–23. On June 17, 2021, the day before the surgery, PA Santiago conducted range of motion testing on Plaintiff's left knee, and measured an active range of motion of between zero and 125 degrees and a passive range of motion of zero-to-130 degrees. *Id.* at 502; *see* JX-8 at US-CitiMedical-00344. Dr. Lomas characterized these ranges of motion as "essentially normal." Tr. 502. Dr. Lomas also testified that, contrary to Dr. Daly's practice in this case, he would have ordered a new MRI before performing the arthroscopy, because "there's a possibility that something has changed dramatically in [the two] intervening years" between when the original MRI was taken and the surgery was performed. *Id.* at 504.

Dr. Daly listed six diagnoses on the postoperative report: superolateral plica, tear of the body of the medial meniscus (in particular, a radial margin tear), tear of the posterior horn of the lateral meniscus (in particular, a tear along the radial margin near the root), a Grade II chondral lesion of the trochlea,[7] loose bodies, and hypertrophic villous synovitis. JX-12 at US-ISASC-00020. Dr. Daly, however, failed to document a horizontal tear of the medial meniscus which had been identified in the April 2019 MRI. Tr. 507. Nor did the photographs of the arthroscopy show a horizontal tear of the medial meniscus. *Id.* at 510.

Dr. Lomas concluded that the photographs of the arthroscopy did not support Dr. Daly's diagnoses and that the photographs showed a normal knee with no derangement or injury. *Id.* at 507. The photographs did not show a radial tear of the body of the medial meniscus, *id.* at 510–12; there was no evidence of a radial tear of the posterior horn of the lateral meniscus, *id.* at 513–

---

[7] On cross examination, Dr. Daly admitted that "even though it's graded as a II, you could call that I." Tr. 142.

14; there was no evidence of a clinically significant superolateral plica, *id.* at 519; there was no evidence of hypertrophic villous synovitis, *id.* at 519–20.  Dr. Lomas acknowledged that there may have been evidence of a Grade II chondral lesion of the trochlea, but stated that a chondral lesion of the trochlea is typically chronic and not indicative of acute trauma.  *Id.* at 517. Dr. Lomas's testimony was supported by Dr. Daly's:  During cross examination, Dr. Daly had difficulty identifying, or admitted that he failed to document, his diagnoses on the pictures that he took during the surgery.  *See id.* at 137–45.

Dr. Lomas also testified that the procedures that Dr. Daly performed on Plaintiff's left knee were not clinically indicated.  *Id.* at 522.  Dr. Daly debrided, or trimmed, the medial meniscus, but there was no evidence of a tear.  *Id.* at 506, 512.  Dr. Daly burned Plaintiff's lateral meniscus with a coblation wand or electrocautery, but there was no indication that the burn was clinically indicated.  *Id.* at 514–15.  As a result, Plaintiff's lateral meniscus was more damaged after the surgery than before the surgery.  *Id.* at 515.  Dr. Daly removed Plaintiff's synovium with an electrocautery device that burns tissue, but the synovium appeared normal in the photographs.  *Id.* at 522.  Dr. Lomas concluded that Plaintiff entered the surgery with a "knee [that] was essentially normal from a structural standpoint, impressively so," and emerged from it with a knee that was damaged by Dr. Daly's actions, including his use of a motorized shaver, electrocautery, and a grasper.  *Id.* at 522–23.  Dr. Lomas testified that, while the diagnostic arthroscopy was potentially medically indicated if Plaintiff's pain had not improved since the accident,[8] none of Dr. Daly's surgical interventions were medically indicated by the evidence

---

[8] At different points in his testimony, Dr. Lomas stated that diagnostic arthroscopy was "probably" indicated.  *See* Tr. 550.  The Court concludes that the more credible and accurate testimony, consistent with the remainder of Dr. Lomas's direct and cross examination, is that there was a "potential" for the arthroscopy to have been indicated if Plaintiff had pain that was not abating.  *See, e.g.*, *id.* at 567.

documented during the arthroscopy. *Id.* at 549–50, 558–59, 567.  As he put it, "I saw photos that demonstrated no damage, then surgical instruments being applied to normal tissue, and damage being enacted by those instruments."[9]  *Id.* at 553.  Based on the fact that Plaintiff's synovium had been resected, the lateral meniscus posterior horn had been burned, the medial meniscus was debrided, and the plica, which appeared "completely normal," had been excised, Dr. Lomas expressed the view that he was "not totally surprised that postoperatively [Plaintiff] has some limitations, although on my exam he did not have those limitations."[10]  Tr. 566.

Approximately one year before trial, Dr. Lomas performed an independent medical examination of Plaintiff.  *Id.* at 523.  His examination of both needs indicated that the knees had normal ranges of motion.  *Id.* at 524.  Plaintiff's gait was normal, indicating that he experienced no pain while walking.  *Id.*  The strength of his knees was intact, *id.*, his reflexes were intact, *id.* at 524–23, and his ligaments were stable, demonstrating that his knees were sufficiently stable to perform the activities of daily living, *id.* at 525–26.  None of the tests Dr. Lomas performed provided any evidence that Plaintiff sustained damage to his knees as a result of the March 2019 Accident.  *Id.* at 526.

---

[9] Dr. Daly confirmed that he used a shaver and a cauterizer and that he removed the plica. Tr. 95–96.  His testimony that the procedures were medically necessary, *id.* at 98, was conclusory and not credible.

[10] During trial, Dr. Lomas observed the arthroscopic pictures in color for the first time.  Tr. 552. On cross examination, Plaintiff's attorney asked Dr. Lomas whether he planned to report Dr. Daly to the "authorities"—presumably, the relevant licensing authorities.  *Id.* at 550–51. Dr. Lomas would not commit to doing so because he was reviewing some of the evidence in real time, but indicated that he was considering doing so.  *Id.*  The Court views this testimony as particularly probative:  It is no easy task for a doctor to report a colleague for lapses in medical judgment.  The fact that Dr. Lomas was considering doing so after reviewing the totality of the medical evidence suggests that Dr. Daly's surgical procedures reflect more than a medical disagreement about the best course of action; they reflect actions that should never have been taken.

Based on his review of the medical records, the MRI imaging related to Plaintiff's knee injuries, and his independent medical examination of Plaintiff, Dr. Lomas concluded that there was no objective evidence of any structural injury that occurred to Plaintiff as a result of the March 2019 Accident. *Id.* at 472–74, 527.

### C.    Anecdotal Evidence of Injury

Plaintiff testified that he feels pain in his left knee and lower back "all the time," *id.* 189, that he feels pain in his lower back when he lifts anything heavy, *id.* at 190, and that that his knees lock up and experience pain while on stairs, walking, and lifting items, *id.* at 190–91. Plaintiff testified on direct examination that he could not lift heavy items at the grocery store, *id.* at 179, that he could not go up and down the stairs and could not walk for a long time and could not sit, *id.* He further testified that he would shop for groceries for his parents only in the event of an emergency. *Id.* at 180.

Plaintiff's testimony lacked credibility in certain important respects and was impeached on cross-examination. His testimony regarding the pain he experienced and the limitations it imposed on his ability to work was undermined by his admission during cross-examination that, following the accident until the time of his surgery in June 2021, he was driving his taxicab and working as a home health aide with his father. *Id.* at 177–78. He would drive the taxicab "sometimes . . . hours [ ] a week, sometimes . . . three hours a day, sometimes … twice a week." *Id.* at 178. He worked as a home health aide two days a week. *Id.*

His testimony on direct examination was also in tension with his admissions during his pretrial deposition that he has continued to live in a third-floor, walk-up apartment, has walked to the grocery store and carried groceries home on a regular basis, and has gone on trips to Florida, California, and Niagara Falls. Plaintiff Dep. 11–12, 26–27, 121, 125–126, 130; *see also* Tr. 187.

He also admitted during cross-examination to have made three lengthy trips to Bangladesh after the March 2019 Accident.  Tr. 188–89, 226–27.

His testimony regarding the pain he experienced and the limitations it created was also inconsistent with his conduct and the statements he made after the accident.  Plaintiff denied having any "neck pain or stiffness" or "joint pain, swelling, muscle weakness, unilateral deficits, or fatigue" during his annual wellness visit with his primary care physician, Dr. Uddin, on October 5, 2019.  JX-13 at US-SafeHealth-00018.  Dr. Uddin's report from the October 2019 wellness visit also states that Plaintiff had a normal active range of motion in his lower extremities.  *Id.*  Plaintiff also testified that he never discussed the March 2019 Accident with Dr. Uddin, Tr. 212, behavior that would not be expected if his injuries were causing him chronic pain.

Plaintiff testified at his deposition and during cross-examination that he continued to drive his taxicab up to the operation, including the day before, and that it was only after the operation that he stopped driving his taxicab and sold his car.  *Id.* at 217.  But reports prepared by Plaintiff's health providers in September 2021 and March 2022—after the date of the surgery—state that Defendant was continuing to work as a taxicab driver at the time of the appointments.  *Id.* at 218–20.  Contrary to his testimony on direct examination, Plaintiff testified at his deposition that until the time of the surgery, he would shop for groceries for his father and would carry the groceries up three flights of stairs to his apartment himself.  *Id.* at 224–25.

Plaintiff has also offered conflicting accounts of his injuries.  He testified at trial on direct examination that he injured his neck during the January 2019 Accident, *id.* at 196, but testified at his deposition that he only injured his arms and hands in that accident, *id.* at 200.  At trial, he testified that he did not recall a no-fault insurance claim he filed after the January 2019 Accident,

but the evidence established he had filed such a claim. *Id.* at 201–02. He testified on direct examination that he repaired his car between the January 2019 Accident and the March 2019 Accident, but at his deposition, he stated that the car had not been repaired. *See id.* at 202–03; Plaintiff Dep. 49.

Plaintiff also gave conflicting accounts regarding the injury to his head and neck during the March 2019 Accident. Tr. 206–08. He testified at trial that he lost consciousness after the March 2019 Accident, but notes from his pain management consultation at CitiMedical on May 24, 2019 indicate that he denied head trauma and loss of consciousness. *Id.* at 207–08; JX-8 at US-CitiMedical-00349. He told Dr. Daly that as a result of the impact from the accident, he immediately began to experience pain in his neck, back, and knees, Tr. 208–09; JX-8 at US-CitiMedical-00278, but he testified at trial that he did not feel any pain after the impact, Tr. 208–09. He also offered conflicting reports about where he hit his head at the time of the accident; at one point, he testified that he hit his head on the car's windshield, but he testified during his deposition that he hit his head on the sunshade, and when confronted with this evidence, he indicated that he hit his head on both the sunshade and the windshield. *Id.* at 205–06.[11]

In sum, and as described in more detail below, the Court finds that the testimony of Plaintiff's witnesses, including Plaintiff himself, Dr. Belayneh, and Dr. Daly, lacked credibility and were unreliable in important respects. The Court has considered each witness separately, the same observations are true with respect to each individually. Their testimony raised serious questions about their credibility: their testimony was contradictory, at times evasive, and

---

[11] Dr. Fischer also testified that during her exam of Plaintiff, "[s]omtimes he seemed to change answers or kind of be vague about certain answers." Tr. 410.

conclusory.  In contrast, the Court finds Defendant's two experts, Dr. Fischer and Dr. Lomas, to be credible and reliable.  Both grappled with the medical evidence, gave thoughtful and direct responses to questions, and demonstrated a knowledge of their respective fields that left little doubt that their answers were not supported by their training and experience as doctors.

## CONCLUSIONS OF LAW

This case arises under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 1402(b), 2401(b), 2671–80 (the "FTCA"), which makes the United States liable for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b).  The FTCA applies to this case, because Sackey was an employee of the United States acting within the scope of his employment at the time of the March 2019 Accident.  Stip. ¶ 5.

In an action brought pursuant to the FTCA, "courts are bound to apply the law of the state . . . where the [tort] occurred."  *Makarova v. United States*, 201 F.3d 110, 114 (2d Cir. 2001); *see also* 28 U.S.C. § 1346(b)(1).  Thus, the law of the state of New York applies to this case because the accident at issue occurred in New York.  Under New York law, to establish that a defendant acted negligently, the plaintiff bears the burden of establishing by a preponderance of the evidence that there was "(1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom."  *Solomon by Solomon v. City of New York*, 489 N.E.2d 1294, 1294 (N.Y. 1985); *see also Aegis Ins. Servs., Inc. v. 7 World Trade Co*., 737 F.3d 166, 177 (2d Cir. 2013); *Polanco v. Unite States,* 2020 WL 6504554, at *12 (S.D.N.Y. Nov. 5, 2020).  Further, the burden is on the plaintiff to prove, by a preponderance of the

evidence, that she is entitled to a damages award.  *See Craig Test Boring Co., Inc. v. Saudi Arabian Airlines Corp.*, 138 F. Supp. 2d 553, 560 (S.D.N.Y. 2001).

After examining the issue of the negligence, the Court turns to the question of whether Plaintiff suffered a "serious injury" as a result of the March 2019 Accident.  The Court concludes that Plaintiff did not, and thus cannot maintain this action under New York's No-Fault Law.

## I.      Negligence

Plaintiff has satisfied his burden of proof that the March 2019 Accident was caused by Sackey's negligence.  New York law provides that "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway."  N.Y. Vehicle and Traffic Law § 1129(a).  A driver in New York thus has a duty to maintain a safe distance between his vehicle and another vehicle and the "failure to do so, in the absence of an adequate explanation, constitute[s] negligence."  *See Inzano v. Brucculeri*, 684 N.Y.S.2d 260, 260 (2d Dep't 1999).  "A driver of a vehicle approaching another vehicle from the rear is required to maintain a reasonably safe distance and rate of speed under the prevailing conditions to avoid colliding with the other vehicle."  *Munoz v. Agenus, Inc.*, 173 N.Y.S.3d 18, 20 (2d Dep't 2022) (quoting *Grier-Key v. Lyons,* 145 N.Y.S.3d 819 (2d Dep't 2021)).  A driver who rear-ends another vehicle is negligent as a matter of law, absent some non-negligent excuse for the collision.  *See Cohen v. Terranella*, 491 N.Y.S.2d 711, 712 (2d Dep't 1985).  Put otherwise, "[a] rear-end collision with a stopped automobile establishes a prima facie case of negligence on the part of the operator of the moving vehicle, and imposes a duty on the operator of the moving vehicle to explain how the accident occurred."  *Ng v. Reid*, 686 N.Y.S.2d 780, 781 (2d Dep't 1999); *see also Russ v. Investech Securities, Inc.*, 775 N.Y.S.2d 867 (2d Dep't 2004) (same).  Although the sudden stop of the lead vehicle may be a valid nonnegligent explanation for a rear-

end collision, "vehicle stops which are foreseeable under the prevailing traffic conditions, even if sudden and frequent, must be anticipated by the driver who follows, since he or she is under a duty to maintain a safe distance between his or her car and the car ahead." *Le Grand v. Silberstein*, 999 N.Y.S.2d 96, 97 (2d Dep't 2014) (quoting *Shamah v. Richmond County Ambulance Serv.*, 719 N.Y.S.2d 287, 288 (2d Dep't 2001)).

The evidence regarding the speed at which Sackey was driving when his truck hit Plaintiff's taxicab and whether Plaintiff was stopped at a red light when he was rear-ended by Sackey is conflicting.  Sackey testified that he was traveling at approximately five miles per hour and that Plaintiff was stopped at a green light.  Tr. 26–28, 59.  Plaintiff testified that Sackey was driving fast and that Plaintiff was stopped at a red light.  *Id.* at 166–67.  Plaintiff's account draws some support from the testimony and the contemporaneous reports of Hinds and the New York Police Department:  Both reports and Hinds's testimony indicate that Plaintiff alleged that he was stopped at a red light and Hinds's report indicates that Plaintiff was traveling at twenty-five miles per hour at the time of the accident.[12]  *See* PX-1 at US0026; PX-4 at US0016; Tr. 253.

The Court finds Sackey's testimony to be more credible and reliable as to the speed of the truck at the time of impact.  Sackey testified credibly that he observed Plaintiff stop when Plaintiff was approximately twenty feet away on Amsterdam Avenue.  Tr. 26, 59.  He also testified credibly that he was driving at the speed limit prior to seeing Plaintiff stop and that he applied his breaks approximately twenty feet from Plaintiff's car.  *Id.* at 29, 31.  Those facts make credible Sackey's testimony that at the moment of impact, his vehicle was traveling approximately five miles an hour.  If he was driving his truck at the speed limit and applied his

---

[12] Hinds also testified that Sackey's testimony that he was traveling at five miles per hour was inconsistent with his understanding of the accident.  *See* Tr. 262.

brakes twenty feet from Plaintiff's vehicle, the speed at which his vehicle was traveling would have drastically decreased.  The only evidence to the contrary comes from Plaintiff's testimony and Hinds's report.  But Plaintiff was the less reliable of the two witnesses.  Although Sackey was confronted at trial with prior inconsistent statements and there were internal inconsistencies in his testimony, many of these inconsistencies appeared to reflect confusion concerning the question asked and the fallibility of memory, not an intentional effort to mislead the Court.  His demeanor was identical on cross examination and direct examination, and there was no appearance of guile or evasion in his testimony.  By contrast, Plaintiff was occasionally evasive, including with respect to important matters at trial, and his testimony was plagued by inconsistences.  Moreover, Plaintiff admitted at trial that, because he was looking forward at the moment of impact and was hit from behind, he did not know the speed at which Sackey was driving.  *Id.* at 211.  And while Plaintiff's attorney suggested through his questioning that the accident report accurately reflected Sackey's estimated speed at the time of the collision, the report simply states "estimated speed."  PX-4 at US0013.  It is thus credible that the report reflects the speed at which Sackey was driving on Amsterdam Avenue before applying his breaks—a speed he would have taken note of—and not the speed the truck was traveling at the time of impact.  Additionally, the damage on Plaintiff's car is more consistent with a seven-ton truck traveling closer to five miles an hour than twenty-five; even attributing all the damage to the March 2019 Accident, a displaced bumper and dented truck pale in comparison to what one would expect from a collision of that magnitude.

The evidence contains more ambiguity as to whether the taxicab stopped at a red or green light at the time of the accident.  The Court, however, finds that it is more likely than not that Plaintiff stopped his vehicle at a red light.  No logical answer was presented as to why Plaintiff

would have suddenly stopped at an intersection if the light were green.  His statement that the light was red—although self-interested—was consistent with his contemporaneous statements. And Sackey's trial testimony that the light was green is undercut by his failure to mention that seemingly important fact to Hinds at the time Hinds was investigating the accident.  At the same time, the Court finds incredible Plaintiff's testimony that he had been sitting at a red light for half a minute at the time of impact and that the light remained red.  Sackey testified credibly that the lights are synchronized on Amsterdam Avenue going uptown.  Tr. 60.  If the light were green at a preceding intersection and the traffic was moving at the speed limit, the light should have also turned green as the traffic approached each subsequent intersection.  There is no evidence that Sackey ran a red light prior to arriving at the intersection of 71st Street and Amsterdam Avenue—or that Plaintiff had done so.  Thus, the most likely course of events is that Plaintiff had appropriately stopped at a red light, but had not proceeded once the light turned green.

The Court also finds that Plaintiff has not proven that the damage to his taxicab was caused by the impact of the collision with Sackey.  Once again, the testimony is conflicting; Plaintiff testified that the damage was caused by Sackey, and Sackey denies that he caused any of the damage.  Plaintiff's account draws some strength from Hinds's accident report, which mentions the damage to Plaintiff's taxicab, and from Hinds's testimony that he understood at the time that Sackey's truck caused the damage.  PX-4 at US0016; Tr. 248–49, 259.  On the other hand, no satisfactory answer was given as to the mechanism by which the damage shown on the taxicab could have been caused by Sackey's truck.  The front of Sackey's truck is flat; there are no protruding parts.  Tr. 50, 54, 67–68, 72, 75.  The bumper on Sackey's truck was lower than Plaintiff's bumper.  And the photographs reflect a dent on one distinct part of Plaintiff's taxicab—the left side of the trunk—and damaged left lights, with no corresponding damage on

the right lights.  *See* Fig. 1.  No other parts of the back of the taxicab were damaged.  Plaintiff has not shown how the accident he described could have caused the damage the photographs depict.  Nor does Hinds's report bolster Plaintiff's claim.  Despite Hinds's testimony that he strives to prepare accurate and complete reports, Tr. 237, Hinds was only at the scene of the accident for a short time and the conditions and time of day—hard rain in the early morning— convince the Court that his report is less than complete.  Indeed, the report does not purport to reflect a conclusion as to whether the accident caused the damage on Plaintiff's car; it merely observes that the taxicab was damaged.  It might have been reasonable for Hinds to assume that the collision caused the visible damage to the taxicab, but his assumption cannot substitute for the Court's evaluation of the evidence.



*Figure 1.  Rear Picture of Plaintiff's Taxicab After the March 2019 Accident.  See JX-5.*

The Court, however, still concludes that Sackey was negligent and that his negligence was the cause of the accident. The conditions were treacherous on the early morning of March 22, 2019. It was raining hard, the sun had not yet risen, and the roadway was slippery. Under those conditions, Sackey had a duty to anticipate that a car in front of him might be stopped and to maintain a safe distance. He failed to do so, and applied his breaks—by his own admission—when he was only twenty feet behind Plaintiff's car. He had other available means of avoiding a collision—for example, he could have moved over a lane. Tr. 32. The color of the light at the time of the accident is irrelevant; Sackey has failed to offer a nonnegligent explanation for the collision, and Plaintiff thus has established his negligence by a preponderance of the evidence. *See Le Grand*, 999 N.Y.S.2d at 97. Having concluded that Defendant was negligent, the Court analyzes whether Plaintiff suffered a serious injury as a result of the March 2019 Accident.

## II.     Serious Injury

The more challenging question is whether the accident caused any of Plaintiff's injuries and whether those injuries constitute a "serious injury" under New York's No-Fault Law. Under the "no-fault insurance" scheme, every car owner must carry automobile insurance which will compensate injured parties for "basic economic loss" resulting from the operation of the vehicle within New York State, regardless of which party was fault. *Pommells v. Perez*, 830 N.E.2d 278, 280 (N.Y. 2005); *see also* N.Y. Ins. Law §§ 5102(a), 5103. The law, however, prohibits injured parties from maintaining an action against a driver unless the injured party suffered a "serious injury." N.Y. Ins. Law § 5104(a). Under Section 5104 of the New York Insurance Law, a "covered person" who has not sustained a "serious injury" as defined in Section 5102(d) cannot recover against another covered person for non-economic loss. *See Goodkin v. United States*, 773 F.2d 19, 22 (2d Cir. 1985). Non-economic loss is defined as "pain and suffering and

similar non-monetary detriment." N.Y. Ins. Law § 5102(c). Thus, a plaintiff may not bring suit for non-economic loss arising from the negligent operation of a motor vehicle unless she shows a "serious injury." *See, e.g.*, *Polanco*, 2020 WL 6504554, at *12; *Satterfield v. Maldonado*, 127 F. Supp. 3d 177, 190 (S.D.N.Y. 2015) (citing N.Y. Ins. Law §§ 5102, 5104). The law partially limits "the rights of automobile accident victims to recover in tort for their injuries . . . replac[ing] what it excised with a relatively simple and straightforward compensation system designed to quickly reimburse injured parties, up to certain limits, for the common, out-of-pocket expenses generated by their injuries." *Goodkin*, 773 F.2d at 21.

The objective of the No-Fault Law is to promote "prompt resolution of injury claims, limit[]cost to consumers[,] and alleviat[e] unnecessary burdens on the courts." *Pommells*, 830 N.E.2d at 280; *see also Bewry v. Colonial Freight Sys.*, 2002 WL 31834434, at *2 (S.D.N.Y. Dec. 17, 2002) (noting that the purpose of New York's no-fault insurance law is "to weed out frivolous claims and limit recovery to significant injuries" (quoting *Dufel v. Green*, 647 N.E.2d 105, 107 (N.Y. 1995)). The law thus "provides a compromise: prompt payment for basic economic loss to injured persons regardless of fault, in exchange for a limitation on litigation to cases involving serious injury." *Pommells*, 830 N.E.2d at 280. Persons who suffer less than a "serious injury" receive prompt compensation under the No-Fault Law, but are forced to forego claims for other than basic economic loss, *i.e.*, for pain and suffering.

This law applies to FTCA actions brought against the United States where the relevant parties are considered "covered persons" under the "no-fault insurance" scheme. *See Patrello v. United States*, 757 F. Supp. 216, 218 (S.D.N.Y. 1991). Plaintiff is a "covered person" under the "no-fault insurance" scheme as the occupant of an insured vehicle in New York State. *See* N.Y.

Ins. Law § 5102(j).  The United States of America also is a "covered person" as defined by New

York Insurance Law Section 5102(j).  *See Patrello*, 757 F. Supp. at 220.

Section 5102(d) carefully delimits what constitutes "serious injury" sufficient to exempt a

victim from the no-fault scheme and to permit recovery for non-economic loss by defining it  as

follows:

> "Serious injury" means a personal injury which results in [1] death;
> dismemberment; significant disfigurement; [2] a fracture; loss of a fetus; permanent
> loss of use of a body organ, member, function or system; [3] permanent
> consequential limitation of use of a body organ or member; [4] significant
> limitation of use of a body function or system; or [5] a medically determined injury
> or impairment of a nonpermanent nature which prevents the injured person from
> performing substantially all of the material acts which constitute such person's
> usual and customary daily activities for not less than ninety days during the one
> hundred eighty days immediately following the occurrence of the injury or
> impairment.

N.Y. Ins. Law § 5102(d).  Moreover, New York courts require "objective proof of a plaintiff's

injury in order to satisfy the statutory serious injury threshold."  *Toure v. Avis Rent A Car Sys.,*

*Inc.*, 774 N.E.2d 1197, 1199 (N.Y. 2002).  "[T]he purpose of enacting an objective verbal

definition of serious injury was to 'significantly reduce the number of automobile personal injury

accident cases litigated in the courts, and thereby help contain the no-fault premium.'"  *Licari v.*

*Elliott*, 441 N.E.2d 1088, 1091 (N.Y. 1982) (citation omitted).  Thus, Plaintiff "may not rely

exclusively on subjective complaints as evidence of a 'serious injury,' and must offer some form

of objective proof of a physiological injury."  *Ruffin v. Rana*, 2013 WL 4834368, at *7 (S.D.N.Y.

Sept. 4, 2013); *see also Scheer v. Koubek*, 512 N.E.2d 309, 309 (N.Y. 1987) ("[T]ransitory pain

does not fall within the objective definition of serious injury as contemplated by the No-Fault

Insurance Law."); *Thompson v. Abassi*, 788 N.Y.S.2d 48, 50–51 (1st Dep't 2005).

In addition, in auto accident cases, a "plaintiff is required to present nonconclusory expert

evidence sufficient to support a finding . . . that the injury was causally related to the accident."

*Diaz v. Anasco*, 831 N.Y.S.2d 398, 399 (1st Dep't 2007); *see also Pommells*, 830 N.E.2d at 283 (affirming grant of summary judgment to defendants where, *inter alia*, "[p]laintiff's submission left wholly unanswered the question whether the claimed symptoms diagnosed by [his orthopedist] were caused by the accident," or, alternatively, by a preexisting kidney disorder) (citations omitted)); *Santos v. UM Cab Corp.*, 112 N.Y.S.3d 30, 31 (1st Dep't 2019) (causation not established where plaintiff's "treating physicians provided only conclusory opinions that the accident caused or exacerbated his conditions, but failed to explain why the degenerative and preexisting conditions reflected in plaintiff's medical records could not be ruled out as the cause of his injuries"); *Carter v. Full Service, Inc.*, 815 N.Y.S.2d 41, 43 (1st Dep't 2006) ("In order to recover damages for noneconomic loss related to a personal injury allegedly sustained in a motor vehicle accident, a plaintiff is required to present competent, nonconclusory expert evidence sufficient to support a finding . . . that the injury was proximately caused by the accident at issue." (citations omitted)); *see also Watson-Tobah v. Royal Moving & Storage, Inc.*, 2014 WL 6865713, at *13–16 (S.D.N.Y. Dec. 5, 2014); *Rhone v. United States*, 2007 WL 3340836, at *6–10 (S.D.N.Y. Nov. 9, 2007); *Arenes v. Mercedes Benz Credit Corp.*, 2006 WL 1517756, at *8 (E.D.N.Y. June 1, 2006). A plaintiff's self-serving testimony "is insufficient as a matter of law to raise a triable issue of proximate causation." *Watson-Tobah*, 2014 WL 6865713, at *14.

In this case, it is undisputed that, as a result of the accident, Plaintiff did not suffer an injury that falls within the first two categories listed above as a result of the March 2019 Accident: he did not suffer (1) death, dismemberment, or significant disfigurement or (2) a fracture, loss of a fetus, or permanent loss of use of a body organ, member, function, or system. Stip. ¶ 14. Plaintiff claims, however, that as a result of the accident, he suffered injuries falling into one of the latter three categories: (1) a permanent consequential limitation of use of a body

member; (2) a significant limitation of use of a body function or system; or (3) a nonpermanent medically determined injury or impairment that prevented him from performing substantially all of the material acts which constitute his usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the March 2019 Accident.  The Court proceeds to analyze Plaintiff's injuries against each of these three categories of "serious injury."  It concludes that Plaintiff has satisfied none of them.

### A.  Permanent Consequential Limitation

"[T]o show a 'permanent consequential limitation of use of a body organ or member,' plaintiff must present evidence that she has suffered a permanent limitation that, though not total, is of sufficient severity to be deemed consequential in comparison to her prior non-injured condition.  *See Ruffin*, 2013 WL 4834368, at *12.  A claimed limitation is "consequential," if a plaintiff has demonstrated that it is "important or significant."  *Vega v. Gomez*, 2012 WL 4069301, at *7 (S.D.N.Y. July 27, 2012) (quoting *June v. Gonet*, 750 N.Y.S.2d 143, 144 (3d Dep't 2002)).  "While there is no set percentage for determining whether a limitation in range of motion is sufficient to establish 'serious injury,' the cases have generally found that a limitation of [20%] or more is significant . . . .  [L]ess than 20% limitation has been found insufficient to survive a motion for summary judgment."  *Hodder v. United States*, 328 F. Supp. 2d 335, 356 (E.D.N.Y. 2004) (collecting cases); *see also Young Sung Lee v. Garvey*, 718 F. App'x 11, 15 (2d Cir. 2017) (citing *Hodder v. United States* when concluding that a 10% limitation in range of motion does not rise to the level of a "serious injury"); *Flores v. Bergtraum*, 2022 WL 125372, at *9 (S.D.N.Y. Jan. 13, 2022).  Courts have further held that "whether a limitation of use or function is 'significant' or 'consequential' (*i.e.*, important) relates to medical significance and involves a comparative determination of the degree or qualitative nature of an injury based on

the normal function, purpose and use of the body part." *Toure*, 774 N.E.2d at 1201 (alterations accepted) (quoting *Dufel*, 647 N.E.2d at 107).

A plaintiff must "produce competent medical evidence that [his] injuries are permanent." *Satterfield*, 127 F. Supp. 3d at 191 (alteration in original) (quoting *Ventra v. United States*, 121 F. Supp. 2d 326, 333 (S.D.N.Y. 2004)).  Although "permanent pain, even of an intermittent character, may form the basis of a serious injury, plaintiff must provide objective medical evidence of the permanence of her pain and must show that the pain is of sufficient severity that it causes her some form of physical limitation." *Ruffin*, 2013 WL 4834368, at *13 (internal quotation marks and citation omitted).

Plaintiff alleges permanent consequential limitations to his cervical spine, his lumbar spine, his right knee, and his left knee.  The Court finds that there is no evidence he suffered any consequential limitation.  First, there is no evidence that Plaintiff has a consequential limitation to his cervical spine as a result of the March 2019 Accident; in fact, there is no evidence that he suffered any consequential limitation to his cervical spine at all.  Prior to the March 2019 Accident, Dr. Belayneh measured Plaintiff's ranges of motion of his cervical spine; she found that he had a flexion range of motion on his cervical spine of forty degrees; an extension range of motion of forty degrees; a left rotation range of motion of sixty degrees; a right rotation range of motion of sixty degrees; a left lateral flexion of twenty degrees; and a right lateral flexion of twenty degrees.  *See* JX-8 at US-CitiMedical-00516.  These measurements were conducted through visual inspection, not using the more accurate goniometer.  Tr. 295.  Still, Dr. Fischer characterized these ranges of motion as "slightly limited," *not* substantial.  *Id.* at 379; *see Rose v. Tall*, 52 N.Y.S. 3d 339, 340 (1st Dep't 2017) ("[N]ormal to near-normal range of motion[ does] not qualify as serious injury.").  These conclusions are supported by Dr. Fischer's own

examination of Plaintiff.  This examination revealed that Plaintiff was neurologically intact, had

full strength in his arms and legs, and could walk and get on and off of the exam table normally.

Tr. 371–72.  Although Dr. Belayneh's working diagnosis after her March 25, 2019 examination

found cervical spine radicular pain, Plaintiff, according to Dr. Fischer, exhibited none of the

symptoms one would expect to see in a patient with cervical radiculopathy.  *See id.* at 395.

Moreover, there was no evidence from the April 2019 MRI images of cervical radiculopathy.  *Id.*

at 402–03.

Even if Plaintiff's cervical spine injury could be said to be consequential, there is no

evidence that the March 2019 Accident *caused* the injury.  Dr. Belayneh measured the range of

motion of Plaintiff's cervical spine after the March 2019 Accident and found his range of motion

unchanged.  *Compare* JX-8 at US-CitiMedical-00286 (March 25, 2019 examination), *with id.* at

US-CitiMedical-00516 (January 28, 2019 examination).  The MRI images of Plaintiff's cervical

spine taken before and after the accident were also identical.[13]  Tr. 399.  Both indicate a

degenerative condition, not an acute one.  *Id.* at 398.  There is some testimony that suggests that

the March 2019 Accident aggravated or exacerbated an injury to Plaintiff's cervical spine.  Dr.

Belayneh testified that, within a reasonable degree of medical certainty, the March 2019 accident

aggravated or exacerbated Plaintiff's pre-existing injury.  Tr. 284.  Her opinion, however, is

based solely upon the close proximity of the January 2019 Accident and the March 2019

Accident and her expectation that, but for the March 2019 Accident, the pain from the January

2019 Accident would have subsided.  *Id.* at 284–85.  But this testimony is directly contracted by

---

[13] Even Plaintiff's expert, Dr. Belayneh, testified there were no substantial changes in the MRI
images of Plaintiff's cervical spine taken before and after the March 2019 Accident.  Tr. 285.

Dr. Fischer, who testified that Plaintiff did not sustain an injury to his cervical spine in the March 2019 Accident.  *See id.* at 371.

The Court finds that Dr. Belayneh's testimony is not credible or convincing. Dr. Belayneh is a physiatrist who treats patients for workers' compensation and car accident cases and her testimony on causation is based solely upon Plaintiff's subjective reports.  *Id.* at 290, 292–93.  She did not use a goniometer when conducting her testing and instead relied on visual observation.  While Dr. Belayneh's testimony is entitled to some weight because she was Plaintiff's treating physician, her opinion as to causation was based solely on the timing of Plaintiff's subjective reports of pain and is not based on any objective evidence.  *Id.* at 284.  Dr. Belayneh did note that there was an annular tear observed on the MRI of Plaintiff's cervical spine taken after the March 2019 accident, but she did not know whether or not that the tear was present on the MRI taken before the March 2019 Accident and testified that the annular tear indicated "nothing significant."  *Id.* at 285.  In contrast, Dr. Fischer is an Associate Professor of Orthopedic Surgery and the Grossman School of Medicine and attending surgeon at New York University Langone Health.  *Id.* at 361.  Her opinion relied on her review of MRI images and reports, Plaintiff's medical records, and an independent medical examination.  *See id.* at 371–72, 374–80, 409–11.  The Court thus credits Dr. Fischer's testimony and finds it both credible and convincing.

Plaintiff also experienced no consequential limitation of the lumbar spine as a result of the March 2019 Accident.  Dr. Belayneh's March 25, 2019 working diagnosis was that Plaintiff suffered a sprain/strain to his lumbar spine and traumatic myofascitis.  Neither is a consequential or permanent limitation.  A spinal sprain/strain—which is identical to traumatic myofascitis—is colloquially known as whiplash; it is not an injury to the structure of the spine.  *See id.* at 381–

82, 394.  Dr. Fischer's examination found that Plaintiff's spin was neurologically intact; her review of the MRI images taken after the March 2019 Accident found that there was no injury of and no abnormal tissue in the lumbar spine; and she noted that Plaintiff's complaints related to his lumbar spine both before and after the accident, as recorded in his medical records, were identical.  *Id.* at 371–72.  Only one witness testified to the MRI images of Plaintiff's lumbar spine: Dr. Fischer.  She testified credibly that there were no disc bulges on the lumbar spine and that Plaintiff has "a very healthy, normal lumbar spine."  *Id.* at 406.  She concluded that Plaintiff did not suffer any limitations on his lumbar spine whatsoever.  *Id.* at 408.

Immediately, following the March 2019 Accident, Dr. Belayneh measured Plaintiff's range of motion on the lumbar spine.  She found that Plaintiff's range of motion had degraded slightly from her January 2019 examination.  *Compare* JX-8 at US-CitiMedical-00286 (March 25, 2019 examination), *with id.* at US-CitiMedical-00516 (January 28, 2019 examination).  Dr. Fischer characterized these results, which were conducted visually and not with a goniometer, of the test as "almost normal . . . maybe slightly limited."  Tr. 380–81.  Further, the medical records credibly show that for the two years after the March 2019 Accident until his surgery, Plaintiff was able to continue to drive his taxicab.  *See generally* JX-8.  Thus, the weight of the evidence indicates that Plaintiff suffered no consequential limitation to his lumbar spine.  *See Reyes v. Se Park*, 8 N.Y.S.3d 22, 23 (1st Dep't 2015) ("Although one of [the] medical experts found some minor limitations in plaintiff's spinal range of motion, those findings did not undermine the expert's conclusion that plaintiff suffered only resolved sprains and that his injuries did not amount to a permanent or significant limitation of use of his spine.").

Plaintiff has no permanent consequential limitation to his right knee and suffered no such injury as a result of the March 2019 Accident.  For three successive examinations following the

47

March 2019 Accident—in March 2019, April 2019, and May 2019—Plaintiff's range of motion

in his right knee was measured at zero-to-130 degrees, essentially a normal range.  Tr. 475–77.

The range of motion of Plaintiff's right knee was also normal in February 2022 when Plaintiff

was examined by Dr. Lomas, *see* Tr. 474, and it was normal in March 2022 when he was

examined by PA Santiago, JX-11 at Alim_00575.  The Court recognizes that Dr. Daly measured

a much more constricted range of motion of Plaintiff's right knee of zero-to-90 degrees in May

2019 and a range of motion of zero-to-115 degrees in February 2021.  JX-8 at

US-CitiMedical-00277, 283.  But Dr. Daly's measurements were based on active range of

motion testing which is less objective than passive range of motion testing, Tr. 500, and therefore

are less reliable.  Further, Dr. Daly relied on visual inspection and "eyeballed it" rather than

using a goniometer.  *Id.* at 122.  Beyond Dr. Daly's measurements, there is no other evidence to

support Plaintiff's claim; tellingly, the evidence establishes that Plaintiff did not experience any

bruising or swelling of his knees as a result of the accident.  JX-8 at US-CitiMedical-00287.

This evidence is insufficient to find any consequential limitation of Plaintiff's right knee.  *See*

*Rosario v. Gonzalez*, 118 N.Y.S.3d 84, 85 (1st Dep't 2020) (conclusory testimony of surgeon

that plaintiff suffered significant limitations not sufficient to raise a genuine issue of fact).

But perhaps more importantly, the Court finds Dr. Daly's conclusory testimony lacks

credibility—and this lack of credibility extends to his contemporaneous medical observations.  It

defies logic that every single doctor who examined Plaintiff would measure the range of motion

in his right knee as essentially normal, but Dr. Daly found a significant limitation in that knee.

The Court refuses to credit these measurements and finds that Dr. Daly's medical records are

entitled to no weight in the Court's analysis.  The only orthopedic expert with credibility, Dr.

Lomas—and the Court finds that Dr. Lomas's testimony was both credible and deserves

significant weight—concluded that he "not find any objective evidence that there were any structural injuries sustained" in Plaintiff's right knee as a result of the March 2019 Accident. Tr. 474. He based this conclusion on a review of the MRI images, which showed only chronic injury to the right knee and no clinically significant structural injuries, and his own examination of Plaintiff. *Id.* at 474, 498–99. In fact, Dr. Belayneh testified that Plaintiff's right knee had normal range of motion and Plaintiff suffered only a "mild injury" as a result of the March 2019 Accident. *Id.* at 281, 324.

The thrust of Plaintiff's argument at trial focus on the injury he suffered in his left knee. However, there is no objective evidence that Plaintiff suffered a consequential limitation in his left knee as a result of the March 2019 Accident.[14] Plaintiff claims that he experiences pain and buckling in his left knee and that this pain and buckling is attributable to the accident. However, the range of motion testing after the accident demonstrated an essentially normal range of motion in Plaintiff's left knee. *Id.* at 475–77. The only objective evidence of any injury to Plaintiff's left knee came from the MRI report from April 2019 and the post-operative report of Dr. Daly from June 2021. The MRI report indicates that there was a horizontal tear along the peripheral edge at the junction of the body and posterior horn of the medial meniscus and a joint effusion in Plaintiff's left knee. JX-8 at US-CitiMedical-00245. But according to Dr. Lomas, the MRI showed no such tear, Tr. 479, and Dr. Daly did not find a horizontal tear during the surgery, *id.* at 99. And while Dr. Daly's postoperative report from June 2021 did identify a tear of the body of the medial meniscus (in addition to five other diagnoses), JX-12 at US-ISASC-00020, no such tears showed up in the April 2019 MRI, refuting any contention that the tear emanated from the

---

[14] The Court addresses below whether the injury resulting from Dr. Daly's surgery can be attributed to the March 2019 Accident, such that Plaintiff can be said to have suffered a serious injury. *See infra* Part II.D.

March 2019 Accident.  Indeed, there is no such evidence that *any* of Dr. Daly's six diagnoses were present during the surgery based on the pictures included in the postoperative report. Tr. 507.  Thus, the Court is left with a straightforward balancing exercise:  It can credit Dr. Daly's post-operative report and testimony or it can credit all the other evidence, including evidence from Plaintiff's own treating physician.  For the reasons already stated by the Court, the evidence presented by Dr. Daly deserves no credit.  The Court thus finds that Plaintiff did not suffer a consequential limitation to his left knee as a result of the March 2019 Accident.

### B.    Significant Limitation

For similar reasons, Plaintiff's claim of a significant limitation also fails.  "A limitation of the use of a body function or system means that the function or system does not operate at all or operates only in some limited way. . . .  [T]he limitation of use must be significant, meaning that the loss is important or meaningful."  N.Y. Pattern Jury Instructions--Civil 2:88F (2023 Ed.).  To fall within the category of a "significant limitation," the injury must be significant in both degree and duration.  *Ruffin*, 2013 WL 4834368, at *13.  A "minor, mild or slight limitation of use" of a body function or system does not constitute a "significant limitation."  *Licari*, 441 N.E.2d at 1091 ("We believe that a minor, mild or slight limitation of use should be classified as insignificant within the meaning of the statute.").  As with all categories of serious injury, the significance of the limitation must be supported by credible medical evidence and must be objectively measured and quantified.  *See Ventra*, 121 F. Supp. 2d at 333–34.  "Subjective complaints of pain are insufficient to establish a significant limitation, unless accompanied by objective, medical evidence of the extent or degree of the limitation and its duration."  *Ruffin*, 2013 WL 4834368, at *14 (internal quotation marks and citation omitted); *see also Adams v. Pagano*, 767 N.Y.S.2d 478–79 (3d Dep't 2003) ("'[M]inor torn fibers' and degenerative changes

inconsistent with the trauma of a motor vehicle accident" or "plaintiff's subjective complaints of pain and stiffness . . . fail to qualify under the statute." (citation omitted)).

While range of motion testing can provide evidence of a significant limitation, because range of motion diagnoses are often based on tests in which the patient has control over her movements, the plaintiff must provide objective evidence of constricted mobility.  *See Satterfield*, 127 F. Supp. 3d at 194–95 (denying plaintiff's claim of serious injury based on constricted range of motion when no objective evidence demonstrated constricted mobility beyond subjective range of motion tests); *Hodder*, 328 F. Supp. 2d at 349 ("New York courts have consistently held that 'a diagnosis of loss of range of motion, because it is dependent on the patient's subjective expressions of pain, is insufficient to support an objective finding of a serious injury.'" (citation omitted)).

Plaintiff has not established through objective medical evidence that he has a significant limitation of the use of a body function or system or had one for a significant period of time as a result of the March 2019 Accident.  At Plaintiff's first three medical visits directly following the March 2019 accident, Dr. Belayneh recorded normal ranges of motion in both of his knees.  *See supra* pp. 48–49.  Though Dr. Daly noted limitations in Plaintiff's range of motion in both of his knees approximately two months after the March 2019 Accident, for all the reasons stated above, the Court does not credit these measurements, especially when they are so clearly refuted by the measurements of Dr. Belayneh and PA Santiago.  Additionally, while Dr. Belayneh noted limitations in Plaintiff's range of motion of his cervical and lumbar spine, there is no evidence that these limitations were significant—and in fact every indication is that they are not significant—or that they were caused by the March 2019 Accident.  *See supra* pp. 44–47.  Even if such evidence existed, these visual observations would be insufficient, standing alone, to

constitute the objective evidence necessary to demonstrate significant injury.  *See Satterfield*, 127 F. Supp. 3d at 194–95.  Even if Plaintiff could establish that the bulging or herniated discs identified on his MRIs, were caused by the March 2019 Accident, "herniated or bulging discs do not *per se* meet the statutory threshold of serious physical injury, without objective evidence of the extent or degree of the alleged physical limitations resulting from the injuries and their duration."  *Gualtieri v. Farina*, 283 F. Supp. 2d 917, 925 (S.D.N.Y. 2003) (quoting *Rose v. Furgerson*, 721 N.Y.S.2d 873, 876 (3d Dep't 2001) (citation omitted)); *accord Watson-Tobah*, 2014 WL 6865713, at *10.  Similarly, even if Plaintiff could prove that he had a meniscus tear and that the tear was caused by the March 2019 Accident, evidence of "meniscus tears" standing alone is "insufficient to establish a serious injury" under New York law, "in the absence of objective evidence of the extent of the alleged physical limitations resulting from the injury and its duration."  *Young Sung Lee*, 718 F. App'x at 15 (quotation marks omitted); *accord McLoud v. Reyes*, 82 A.D.3d 848, 849 (2d Dep't 2011).  Plaintiff has presented no such evidence.  Accordingly, Plaintiff cannot establish he suffered significant injuries.

### C.     90/180 Day Standard

Finally, the evidence does not establish a serious injury under the 90/180 standard.  Under New York's No-Fault Law, a plaintiff suffers a serious injury when "a medically determined injury or impairment of a non-permanent nature . . . prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment."  N.Y. Ins. Law § 5102(d).  "[T]he words 'substantially all' should be construed to mean that the person has been curtailed from performing his usual activities to a great extent rather than some slight curtailment."  *Licari*, 441 N.E.2d at 1091.  A plaintiff must "submit competent medical evidence to support her

claim that she was unable to perform substantially all of her daily activities for not less than 90 of the 180 days immediately following the accident, as a result of the subject accident." *Escoto v. United States*, 848 F. Supp. 2d 315, 330 (E.D.N.Y. 2012) (collecting cases). This objective medial evidence must tie "the alleged limits on [a plaintiff's] activities to the injuries" she sustained in the car accident. *Mercado v. Lee*, 2008 WL 4963985, at *6 (S.D.N.Y. Nov. 21, 2008). It cannot be purely anecdotal; a plaintiff claiming that he could not or cannot engage in certain activities must show that any restrictions were medically indicated. *See Mercado*, 2008 WL 4963985, at *6; *see also Ruffin*, 2013 WL 4834368, at *15. By the same logic, self-serving statements by a plaintiff alone will never be sufficient to establish a serious injury. *See Gualtieri*, 283 F. Supp. 2d at 925; *Escoto*, 848 F. Supp. 2d at 330.

Plaintiff claims that the medical reports generated contemporaneously to his March 2019 Accident establish that he suffered a serious injury under the 90/180 standard. These reports, Plaintiff suggests, show that he suffered physical limitations to the motion of his cervical spine, lumbar spine, and knees. However, as the Court detailed, the medical evidence demonstrated the opposite, that Plaintiff did not suffer from significant physical limitations. Nor does the anecdotal evidence of physical injury that Plaintiff presented save his case. He testified that he feels pain in his left knee and lower back "all the time." Tr. 189–91. This pain prevented him from lifting heavy items, walking up and down stairs, walking or sitting for significant periods of times, and shopping for grocers. *Id.* at 179–80. But Plaintiff's testimony—even if it reflects current limitations—does not establish that he experienced these limitations in the 180-day period following the accident. In fact, the evidence establishes the opposite. On cross-examination he acknowledged that, following the accident until the time of his surgery in June 2021, he was driving his taxicab and working as a home health aide. *Id.* at 177–78. In his pre-

trial deposition, he admitted that he continued to live in a third-floor, walk-up apartment, has walked to the grocery store and carried groceries home on a regular basis, and has gone on trips to Florida, California, and Niagara Falls.  Plaintiff Dep. 11–12, 26–27, 121, 125–126, 130; *see also* Tr. 187.  And soon after the 180-day period expired, Plaintiff denied during his annual wellness visit with his primary care doctor that he had any "neck pain or stiffness" or "joint pain, swelling, muscle weakness, unilateral deficits, or fatigue."  JX-13 at US-SafeHealth-00018.  Thus, Plaintiff has not presented evidence from which the Court could conclude that his injuries prevented him from undertaking substantially all of his activities of daily living for at least 90 days of the 180-day period following the March 2019 Accident.

In sum, Plaintiff has not demonstrated by a preponderance of the evidence that he sustained "serious injury," as defined by New York Insurance Law § 5102(d), from the March 2019 Accident.  Therefore, he cannot recover any non-economic damages from the United States.

## III.    Serious Injury Resulting from Dr. Daly's Surgery

Plaintiff argues that even if he did not suffer serious injury directly after the March 2019 Accident, he was seriously injured during the operation on his left knee, and that this injury qualifies as a serious injury attributable to the March 2019 Accident under New York's No-Fault Law.  There are two flaws with Plaintiff's argument.  First, there is insufficient medical evidence that Plaintiff currently suffers from a serious injury within the meaning of the No-Fault Law or that he sustained such an injury as a result of the 2021 arthroscopic surgery.  Second, the law upon which Plaintiff relies is relevant only to damages, not to causation, and thus does not establish that Defendant's actions caused his injury.

In addition to the MRI from April 2019, there is additional evidence from the medical records and Plaintiff's subjective testimony that Plaintiff has some limitations in his left knee,

which began after the surgery administered by Dr. Daly.  In the immediate aftermath of the accident, Plaintiff's left knee had range of motion in the near normal or normal range; however, Dr. Daly's post-operative report from June 2021 stated Plaintiff had active range of motion of between zero and 112 degrees.  JX-8 at US-CitiMedical-00271.  After the operation, Dr. Belayneh consistently measured Plaintiff's range of motion in his left knee at between zero and 115 degrees.  *See generally* JX-11.  Defendant's orthopedic expert conceded that an active range of motion of even 115 degrees could represent, depending on context, a consequential limitation to the range of motion for the knee.  Tr. 565.  However, other evidence from the medical records calls into question the credibility of the findings regarding Plaintiff's active range of motion.

First, Dr. Lomas testified that he examined passive range of motion in both of Plaintiff's knees during an independent medical examination approximately a year before trial in February 2022.  *Id.* at 523.  While Dr. Daly relied on visual inspection for his measurement of Plaintiff's active range of motion, Dr. Lomas relied on a goniometer and conducted the more reliable passive range of motion test.  *Id.* at 523–24.  During Dr. Lomas's examination of Plaintiff, all of his other tests indicated that there were no structural problems with Plaintiff's left knee.  *See id.* at 523–26.  As Dr. Lomas concluded, he could "not find any evidence supporting any structural reason for limitations to [Plaintiff's] knees."  *Id.* at 527.  Dr. Lomas's findings are supported by Plaintiff's own medical provider, PA Santiago, who found that Plaintiff had a normal passive range of motion in his left knee of between zero and 130 degrees during an evaluation conducted in close proximity to Dr. Lomas's evaluation in March 2022.  JX-11 at Alim_00575.  Further, Plaintiff reported minimal post-operative pain and was able to perform seated squats during his first postoperative visit.  JX-8 at US-CitiMedical-00270.  For the reasons stated above, the Court

credits Dr. Lomas's testimony, not Dr. Daly's.  In fact, Dr. Daly's testimony contradicts any suggestion that his surgery caused Plaintiff a serious injury.  At his deposition, he testified that he did not believe Plaintiff had any permanent limitation in the use of his left knee.  *See* Tr. 147–48.[15]

Moreover, even if the evidence established that Plaintiff sustained a serious injury as a result of his June 2021 surgery, the Court rejects the argument that such evidence would suffice to establish that the March 2019 Accident caused a serious injury.  New York's No-Fault Law prohibits recovery of non-economic loss "for personal injuries arising out of negligence in the use or operation of a motor vehicle . . . except in the case of a serious injury."  N.Y. Ins. Law § 5104(d) (emphasis added).  Thus, a plaintiff must establish by the preponderance of the evidence that the serious injury was casually related to a defendant's negligent actions.  *See Pommells*, 830 N.E.2d at 286 (under New York's no-fault scheme, plaintiff bears the ultimate "burden of coming forward with evidence indicating a serious injury causally related to the accident").  In this case, however, the surgery itself is an intervening subsequent event that breaks the chain of causation and renders Plaintiff's injury too remote.

"When a question of proximate cause involves an intervening act, 'liability turns upon whether the intervening act is a *normal or foreseeable consequence* of the situation created by the defendant's negligence.'"  *Hain v. Jamison*, 68 N.E.3d 1233, 1237 (N.Y. 2016) (emphasis in original) (quoting *Mazella v. Beals*, 57 N.E.3d 1083, 1091 (N.Y. 2016)).  "If the intervening act

---

[15] Even if Dr. Daly's and Dr. Belayneh's measurements are credited, and the Court were to conclude that the range of motion of Plaintiff's left knee was between zero and 115 degrees, this limitation would not constitute a serious injury.  This range of motion would represent an approximately 15% deviation from a normal range of motion of between zero and 135 degrees, *see* Tr. 524, which courts have found to be insufficient to constitute a serious injury.  *See Flores*, 2022 WL 125372, at *9 (collecting cases) (less than 20% limitation not significant); *Naro v. Patterson*, 2013 WL 12109398, at *10 (S.D.N.Y. Oct. 31, 2013) (same).

is extraordinary under the circumstances, not foreseeable in the normal course of events, or

independent of or far removed from the defendant's conduct, it may well be a superseding act

which breaks the causal nexus." *Derdiarian v. Felix Contracting Corp.*, 414 N.E.2d 666, 670

(N.Y. 1980). "Stated differently, proximate cause will be found lacking where the original

negligent act merely 'furnished the occasion for'—but did not cause—'an unrelated act to cause

injuries not ordinarily anticipated.'" *Hain*, 68 N.E.3d at 1238 (citation omitted). The New York

Court of Appeals has instructed courts to look to a number of factors when determining whether

an intervening act breaks the chain of causation, including:

> the foreseeability of the event resulting in injury; the passage of time between the
> originally negligent act and the intervening act; the spatial gap, if any, between the
> original act and the intervening act; whether the original act of negligence was a
> completed occurrence or was ongoing at the time of the intervening act; whether
> and, if so, what other forces combined to bring about the harm; as well as public
> policy considerations regarding the scope of liability.

*Id.* It is not enough that the original act of negligence "place the injured party at the site of the

[subsequent] accident"; if "the intervening act was divorced from and not the foreseeable risk

associated with the original negligence," then the causal chain will be broken. *Derdiarin*,

414 N.E.2d at 671.

Defendant argues that the causal chain was broken because there is no evidence that the

surgery was necessitated by the accident. Dkt. No. 58 at 2–3. Plaintiff counters that "[i]t is

settled law in New York that a tortfeasor is responsible for the subsequent negligence of a

physician because 'their wrongs coalesced and resulted in damage which would not have been

sustained but for the original injury.'" Dkt. No. 57 at 2 (quoting *Milks v. McIver*, 190 N.E. 487,

488 (N.Y. 1934)). The Court agrees with Defendant.

As the Court found, Dr. Daly's surgery of Plaintiff's knee was not medically necessary.

The MRI report from April 2019 indicated that Plaintiff suffered from a horizontal tear along his

medial meniscus.  JX-8 at US-CitiMedical-00245.  However, as noted, the underlying MRI images, which Dr. Daly did not review, did not show a tear of the medial meniscus.  *See* Tr. 124, 479–80.  The fact that Plaintiff's pain did not subside despite physical therapy may have indicated a diagnostic arthroscopy.  *See id.* at 567.  But the arthroscopy itself, as documented in Dr. Daly's pictures, did not actually demonstrate any of the six diagnoses that Dr. Daly claims to have observed.  *Id.* at 507.  It also did not demonstrate the medial meniscus tear reflected in the April 2019 MRI report.  In fact, it "demonstrated no damage" at all to Plaintiff's knee.  *Id.* at 533.  Thus, Dr. Daly's surgical interventions were not medically indicated; they were "applied to normal tissues" and "damage[d]" that tissue.  *Id.*  Had Dr. Daly reviewed the MRI slides, as the evidence suggests he should have, he would never have conducted a surgical arthroscopy in the first place.  At most, it might have been "normal or foreseeable" that Dr. Daly would conduct a diagnostic arthroscopy.  It would not have been normal or foreseeable that he would have conducted a surgical arthroscopy, an entirely unnecessary procedure not supported by any of the diagnostic tests, much less done so negligently, causing injury to Plaintiff and damage to his entirely healthy tissue.  Thus, even assuming Dr. Daly's surgery caused Plaintiff to suffer a serious injury, the serious injury was not the proximate cause of Defendant's negligence.

Plaintiff relies, in part, on New York Pattern Jury Instruction 2:305 ("PJI 2:305") to argue that Defendant may be held responsible for "any aggravation of the injury and for any additional pain and suffering caused by any negligence or lack of skill of any doctor who treated the plaintiff for the original injury."  PJI 2:305.  Yet as Defendant correctly argues, PJI 2:305 addresses the question of damages and presupposes causation; the jury instruction only becomes relevant "[i]f you find that the defendant was negligent and that *defendant's negligence caused plaintiff's* injury."  *Id.*  Thus, the pattern jury instruction and the settled law upon which the

instruction relies, might permit a plaintiff who has suffered a serious injury to recover damages for any additional injury she suffers as a result of malpractice by a doctor treating the plaintiff for her original injury.  It does not, however, entitle a plaintiff who has not suffered a serious injury within the meaning of the No-Fault Law to avoid the limitations of New York's no-fault insurance regime because a subsequent, unnecessary operation caused the plaintiff injury.

*Peralta v. Quintero*, 20 F. Supp. 3d 462 (S.D.N.Y. 2014) *aff'd*, 669 F. App'x 64 (2d Cir. 2016), upon which Plaintiff relies, is also not to the contrary.  In that case, the court found that the plaintiff suffered a serious injury as a result of an automobile accident.  *Id.* at 466–67.  The question, as the court analyzed it, was one of damages—whether a plaintiff who suffered serious injury as a result of an automobile accident should also be able to recover additional damages for continuing back problems he suffered as a result of a surgery that was undertaken in connection with the accident but that was unnecessary and might constitute medical malpractice.  Applying the "settled law in New York that a tortfeasor is responsible for the subsequent negligence of a physician because 'their wrongs coalesced and resulted in damage which would not have been sustained but for the original injury,'" the court rejected the argument that plaintiff was not entitled to recover damages for his continuing back problems.  *Id.* at 467 (quoting *Milks*, 190 N.E. at 488).  The court, however, did not have occasion to address whether serious injury caused by subsequent malpractice could substitute for serious injury caused by the accident itself because the question was not presented.  The result in *Peralta* thus lends no support to Plaintiff's argument here.

Finally, this theory of liability is barred by Plaintiff's failure to disclose it prior to the close of evidence.  Plaintiff did not disclose this theory in his complaint, during discovery, or in the joint pre-trial order; it was discussed for the first time during Plaintiff's closing statement.

*See* Tr. 594.  "The basic purpose of the federal rules, particularly those concerning discovery and disclosure, is to eliminate trial by ambush, sometimes called the sporting theory of justice, and avoid the very kind of surprise practiced upon the defense in this case."  *Ginns v. Towle*, 361 F.2d 798, 801 (2d Cir. 1966).  Thus, a court "may modify the order issued after a final pretrial conference only to prevent manifest injustice."  Fed. R. Civ. P. 16(e).  "In making such a determination, the court should balance 'the need for doing justice on the merits between the parties . . . against the need for maintaining orderly and efficient procedural arrangements'" and consider "whether any prejudice to the opposing side will result."  *Henry v. Dep't of Transp.*, 69 F. App'x 478, 481 (2d Cir. 2003) (first quoting *Laguna v. Am. Exp. Isbrandtsen Lines, Inc.*, 439 F.2d 97, 101 (2d Cir. 1971); then quoting *Ismail v. Cohen*, 706 F. Supp. 243, 255 (S.D.N.Y.1989), *aff'd in relevant part and rev'd in part on other grounds*, 899 F.2d 183 (2d Cir.1990)).  The Court finds that permitting Plaintiff to proceed with this theory would cause Defendant prejudice.  As the Government persuasively argues, if Plaintiff had raised this theory of liability earlier in litigation, "the Government's conduct of this litigation and its presentation of evidence at trial, including its cross-examination of Dr. Daly, would have been markedly different."  Dkt. No. 58 at 9.  Courts in this circuit have previously rejected the late introduction of new theories of liability when they risk unduly prejudicing defendants, and the Court follows that precedent in this case.  *See, e.g.*, *Andrus v. Juniper Grp. Inc.*, 2011 WL 4532694, at *4 (E.D.N.Y. Sept. 26, 2011) ("Permitting Plaintiff to raise this new theory of liability at this stage in the litigation would unduly prejudice Defendants, so the Court will not address or consider the merits of this argument.").

For all these reasons, the Court holds that Plaintiff has not met the evidentiary burden required to show he suffered a serious injury as a result of the March 2019 Accident.

## CONCLUSION

For these reasons, the Court finds that Plaintiff is not entitled to damages under the FTCA.  The Clerk of Court is respectfully directed to enter judgment for Defendant and to close this case.

SO ORDERED.

Dated: April 13, 2023
     New York, New York

LEWIS J. LIMAN
United States District Judge